# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT CHATTANOOGA

| | | |
|---|---|---|
| BUILDERS MUTUAL INSURANCE COMPANY, | ) ) | Case No. 1:22-cv-208 |
| | ) | |
| *Plaintiff/Counter-Defendant*, | ) | Judge Travis R. McDonough |
| | ) | |
| v. | ) | Magistrate Judge Christopher H. Steger |
| | ) | |
| GCC CONSTRUCTION, LLC and TAHINI MAIN STREET, LLC, | ) ) | |
| | ) | |
| *Defendants/Counter-Claimants*. | ) | |

---

## MEMORANDUM OPINION

---

On December 20, 2023, the Court granted Defendants/Counter-Claimants GCC

Construction, LLC ("GCC") and Tahini Main Street, LLC's ("Tahini") motion to revise the

Court's November 30, 2023 memorandum opinion and stated it would enter a revised

memorandum opinion at a later date. (Doc. 151, at 4.) This revised memorandum opinion

wholly supplants the Court's previously filed memorandum opinion.[1]

---

[1] In its December 20, 2023 order, the Court only discussed revisions with respect to whether genuine issues of material fact existed as to whether the collapse of bricks that fell on November 15, 2021, rendered the west wall structurally unsound and as to whether there is coverage under the policy for the removal and replacement of the portion of the exterior west wall that remained standing. (Doc. 151, at 4.) However, GCC and Tahini also moved to revise the opinion on two additional grounds not addressed in the Court's December 20, 2023 order: (1) whether "the Existing Building(s) or Structure(s) coverage endorsement controls damages resulting from a 'collapse'"; and (2) whether "genuine issues of material fact remain as to Tahini's fraud and misrepresentation count." (Doc. 135, at 6–7.) The Court **GRANTS IN PART AND DENIES IN PART** the motion to revise with respect to these two issues. The Court revises the section of the opinion discussing Tahini's lost rental profit below, but it does not revise the section regarding Tahini's fraud-and-misrepresentation counterclaim.

First, the existing building(s) or structure(s) endorsement provides the method of calculating "[t]he most [Builders Mutual] will pay for any 'loss' to the existing building(s) or structure(s)."

(Doc. 89-10, at 21.)  This endorsement changes how the amount of loss is calculated; it does not change what is a "loss."  This previously unidentified endorsement does not change the Court's analysis regarding whether Tahini's lost rental profit is a "direct physical loss" covered by the policy.

However, Colby Butterfield's opinion does change the Court's analysis with respect to whether Tahini's lost rental profit is covered under the policy.  In its November 30, 2023 memorandum opinion, the Court concluded that "the undisputed facts demonstrate that the lost rental profit stemmed from the impaired structural integrity of the wall, not the fallen bricks" and concluded that, because the lack of structural integrity was not a "collapse" and also did not result from a "collapse," the rental profit did not result from a "collapse."  (Doc. 132. at 36–37.)  Accordingly, the Court concluded that Tahini's lost rental profit was not covered by the policy.  (*Id.* at 37.)

But, as discussed in the Court's order December 20, 2023 order, Butterfield's opinion creates a factual dispute as to whether the collapse of the fallen bricks caused the building to become structurally impaired.  (Doc. 151, at 3–4.)  If the fallen bricks—which the Court found constituted a "collapse"—caused the structural instability in the west wall, which then in turned caused the building to become unrentable, then Tahini's lost rental profit would be covered under the policy.  Therefore, the Court revises this section of the opinion below.

Second, GCC and Tahini argue that a genuine issue of material fact remains as to Tahini's fraud-and-misrepresentation counterclaim.  (Doc. 135, at 7.)  The Court disagrees.  In its November 30, 2023 memorandum opinion the Court granted Builders Mutual's motion for summary judgment on Tahini's counterclaim for fraud and misrepresentation.  (Doc. 132, at 44–45.)  The Court reasoned that GCC and Tahini provided "no evidence that could support a finding that [Builders Mutual's] representations were false when Builders Mutual made them or that Builders Mutual knew these statements were false, did not believe them to be true, or was reckless in making them."  (*Id.* at 45.)  The Court also concluded that "these statements all involved Builders Mutual's future intent to investigate a claim or review the engineering reports" and future statements are not actionable as fraud.  (*Id.*)

In the fraud-and-misrepresentation section of their response to Builders Mutual's motion for summary judgment, GCC and Tahini did not include a single citation to the joint appendix in the portion of their brief discussing Tahini's fraud counterclaim.  (*See* Doc. 103, at 11–13.)  Rather, they stated that "Builders Mutual knew all along that it would maintain its denial of the claim and had already engaged counsel to file suit against its insured, all the while leading GCC and Tahini to believe that it was actually still considering the claim."  (*Id.* at 12.)

GCC and Tahini now point to specific evidence.  (*See* Doc. 135, at 8–10.)  But none creates a material issue of fact.  GCC and Tahini argue that Builders Mutual represented that "we are seriously reviewing" the updated information provided in GCC and Tahini's insurance claim when it was instead preparing for litigation.  (*Id.*)  GCC and Tahini emphasize that Builders Mutual represented that "we **are** seriously reviewing" the submitted materials, and such a statement is a representation of present fact.  (*Id.* at 10 (emphasis in original).)  But this evidence fails to establish a question of fact on Tahini's counterclaim for two reasons.

First, the provided evidence does not contradict Builders Mutual's representation that they were "seriously reviewing" the claim.  (*Id.* at 10.)  Tahini focuses on the fact that Builders Mutual obtained a coverage opinion and engaged counsel to file this present action.  (*Id.* at 9–10.)  But

Before the Court is Plaintiff/Counter-Defendant Builders Mutual Insurance Company's ("Builders Mutual") motion for summary judgment (Doc. 88) and GCC and Tahini's motion for partial summary judgment (Doc. 94). Also before the Court are GCC and Tahini's joint motion to exclude expert testimony of Matthew G. Richardson and John Speweik (Doc. 92), GCC and Tahini's motion to strike testimony cited by Builders Mutual in support of its motion for summary judgment (Doc. 104), and Builders Mutual's motions to exclude certain expert testimony from William Warfel (Doc. 96) and Arch Willingham (Doc. 97).

For the following reasons, Builders Mutual's motion for summary judgment (Doc. 88) will be **GRANTED IN PART** and **DENIED IN PART**, GCC and Tahini's joint motion for partial summary judgment (Doc. 94) will be **GRANTED IN PART AND DENIED IN PART**, GCC and Tahini's joint motion to exclude expert testimony of Matthew G. Richardson and John Speweik (Doc. 92) will be **GRANTED IN PART** and **DENIED IN PART**, GCC and Tahini's motion to strike (Doc. 104) will be **DENIED**, Builders Mutual's motion to exclude certain expert

---

these actions are not mutually exclusive with continuing to review the claim. Builders Mutual could have been obtaining a coverage opinion, preparing for litigation, and continuing to investigate the merits of the claim at the same time. And Tahini provides no evidence this was not the case. Nor does Susan McCracken's statement that it would not be fair or honest to request an extension if Builders Mutual had already engaged counsel to file an action show the "seriously reviewing" was false. Whether action is "fair" or "honest" is a different inquiry from whether it is fraudulent, and there is no evidence that Builders Mutual was not "seriously reviewing" the claim. There is nothing inherently fraudulent about hiring counsel or seeking redress in court.

Second, GCC and Tahini provide no evidence they were damaged by these representations or that these representations were material. A statement that Builders Mutual was "seriously reviewing" its claim could not have induced Tahini to make a decision that caused it any damage. Tahini had already resubmitted the claim and was only waiting for a response to this claim. Tahini provides no evidence or even argument that the statement caused them to behave any differently or incur any damage. The only action Tahini appears to have taken based on this statement was allowing Builders Mutual a twenty-one day extension, and Builders Mutual filed this action eight days later.

Therefore, the Court denies GCC and Tahini's motion to revise with respect to this issue.

testimony from William Warfel (Doc. 96) will be **GRANTED**, and Builders Mutual's motion to exclude certain opinions of Arch Willingham (Doc. 97) will be **GRANTED**.

## I.     BACKGROUND

### A.     Factual Background

This case involves what used to be an over hundred-year-old, three-story building located at 27 West Main Street in Chattanooga, Tennessee.[2]  (Doc. 89-16, at 1.)  Tahini owned the building and contracted with GCC for renovations.  (Doc. 89-15, at 15.)  Before beginning work, GCC and Tahini obtained an insurance policy—effective September 2, 2021, through September 2, 2022—from Builders Mutual.  (Doc. 89-3, at 3–4.)

#### i.     *The Insurance Policy*

The policy provided that Builders Mutual would "pay for direct physical 'loss' to [the building] from any Covered Cause of Loss described in the Coverage Form."  (*Id.* at 9; Doc. 89-10, at 7.)  The policy defined "loss" as "accidental loss" or "accidental damages."  (Doc. 89-10, at 18.)  Relevant here, one such "Covered Cause of Loss" is "collapse."  (*Id.* at 8.)  The policy provides the following regarding "collapse":

> (1) We will pay for direct physical loss or damage to Covered Property, caused by collapse of all or part of a building or structure caused by one of more of the following:
>
> (a) Fire; lightning; windstorm; hail; explosion; smoke; aircraft; vehicles; riots; civil commotion; vandalism; breakage of glass; falling objects; weight of snow, ice or sleet; "water damage"; but only if the causes of "loss" are otherwise covered in this Coverage Form;

---

[2] The Court notes that, while this dispute involves whether the exterior west wall suffered a "collapse" under the terms of an insurance policy, the building certainly "collapsed" in the colloquial sense shortly after the action was filed.  *See* Ellen Gurst, *Brick Wall Collapses, Crushes Car in Downtown Chattanooga*, CHATTANOOGA TIMES FREE PRESS (Jan. 12, 2023), https://www.timesfreepress.com /news/2023/jan/12/brick-wall-collapses-tfp/.  The facts necessary to resolve this dispute occurred before this January 2023 incident, and the article does not impact the Court's resolution of the pending motions.

(b) Decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

(c) Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

(d) Weight of people or personal property;

(e) Weight of rain that collects on a roof;

(f) Use of defective materials or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

(2) With respect to a covered building or structure;

(a) Collapse means an abrupt falling down or caving in of a covered building or structure in whole or in part;

(b) A covered building or structure or any part thereof that is in danger of falling down or caving in is not considered to be in a state of collapse;

(c) A part of a covered building or structure that is not standing is not considered to be in a state of collapse even if it has separated from another part of the building or structure;

(d) A covered building or structure that is standing or any part of a covered building or structure that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

(*Id.*) The policy also contains an exclusion which provides that Builders Mutual "will not pay for a 'loss' caused by or resulting from . . . [c]ollapse, except as provided in the Additional Coverage section in this Coverage Form." (*Id.* at 11–13.)

### ii. The "Collapse"

Part of the renovations required cutting windows into the building's brick, exterior west wall. (Doc. 89-7, at 6, 8.) Before these renovations, Tahini retained David Cartwright, an engineer, to conduct an initial assessment of the building in September 2020. (Doc. 89-4, at 3–4.) Cartwright noted that the exterior west wall was weak and suggested "shotcreting" the wall—a form of spray-on concrete—to strengthen it before renovation. (*Id.* at 6.) Ultimately, Tahini and GCC decided against shotcreting because it was "too expensive." (*Id.*) Before work began, some exterior brick was loose and could be scraped away by hand, exterior bricks were

5

"spalling"—chipping or breaking into fragments—and Tahini and GCC were aware of "the nature of the wall." (Doc. 89-5, at 7–8; Doc. 89-6, at 3, 8.)

On November 15, 2021, renovations began. (Doc. 89-7, at 9.) When a worker made the first cut for the windows, "brick started falling from places it shouldn't be falling from," including "all corners, the tops, [and] the sides" of the wall. (*Id.* at 9; Doc. 89-3, at 3, 70.) After this, Cartwright returned and inspected the building. (Doc. 89-4, at 10.) He observed the wall was "falling out" and "was crumbly." (*Id.*) After his visit, Cartwright prepared a report[3] in which he concluded "that due to the severe unforeseen deterioration only recently uncovered inside the existing West Brick Wall, that it is not structurally viable to carry the loads for the new renovation." (Doc. 89-13, at 2.) Cartwright recommended "that a new structural wall be installed and that the old brick wall be demolished." (*Id.*) He also testified that "[t]he interior of the wall was collapsing when it was cut. Doesn't mean that the whole wall was imminent of collapse right then. If we continued on cutting holes . . . it would be drastically unstable." (Doc. 89-4, at 11.)

Colby Butterfield, P.E., an engineering expert, reviewed Cartwright's report. (Doc. 135-1, at 5.) Based on the report and images of the building, he opined that: (1) "[t]he West Wall was part of the building's structural assembly, and the partial collapse of the center wythe of bricks robbed the West Wall of its structural integrity, leaving, at best, two far weaker walls created by the outermost and innermost wythes of brick that could not rely on each other for support; and (2) [b]ecause of the West Wall's status as part of the overall structural assembly of the building, the structural stability of the North Wall and the South Wall were also negatively

---

[3] In the parties' briefing and in depositions, this report is often referred to as the "Estes-Russell Engineering Report." (*See, e.g.*, Doc. 92-1, at 4.) The Court will simply refer to this as Cartwright's report.

affected by both the partial collapse on November 15, 2021 and the required demolition of the West Wall, and each would have required substantial repair to restore integrity to the overall structural assembly of the building." (*Id.* at 6.)

### iii. *Builders Mutual's Investigation*

Shortly thereafter, GCC and Tahini submitted a claim to Builders Mutual under the policy, representing that the "building [was] in a state of failure/collapse" and that they "have budgeted the remaining demolition of the west wall at $500k."[4] (Doc. 89-13, at 1.) This "collapse" was premised on Cartwright's opinion that, "due to the severe unforeseen deterioration only recently uncovered inside the existing West Brick Wall, [] it is not structurally viable to carry the loads of the new renovation." (*Id.* at 2.) Builders Mutual received notice of this claim on November 18, 2021, opened a claim file, and hired Collins & Co. to inspect the building. (Doc. 83-2, at 9; Doc. 89-3, at 12.) The next day, Collins & Co. sent an adjuster, Greg Bankston, to the site. (Doc. 83-2, at 9.) Bankston is not an engineer, and Builders Mutual did not hire an engineer to inspect the building. (Doc. 89-3, at 19, 33.) Upon arriving, Bankston "looked at the building [and saw] the wall hadn't collapsed," so he "contacted Builders Mutual and relayed the information to them, that the wall has not collapsed." (Doc. 89-8, at 6.) Bankston did not create any report for the claim file; he orally reported his findings that the wall had not collapsed and submitted pictures to Builders Mutual. (*Id.* at 12–13.) GCC and Tahini submitted Cartwright's report to Builders Mutual alongside their claim. (Doc. 89-5, at 15.)

---

[4] GCC and Tahini represent that this claim was based on "a collapse of the internal column or wythe of the existing three (3) wythe brick wall on the west side of the structure" that was "caused by decay that was hidden from view with regard to the nature and condition of the internal aspects of the brick wall." (Doc. 95, at 4.) However, they cite to Cartwright's updated report that was prepared in June 2022. (*Id.* (first citing Doc. 89-22, at 10; and then citing Doc. 89-23, at 1).) Cartwright's original report submitted alongside the claim in November 2021 makes no such conclusion.

After talking with Bankston, reviewing his photographs, and reviewing Cartwright's report, Builders Mutual informed GCC and Tahini that there was no coverage available for the loss. (Doc. 89-14, at 1.) It first did so informally in an email on November 29, 2021, in which it stated "this wall has deteriorated over time and the 'collapse' is not being caused by a covered peril such as fire, lightning, windstorm, hail or etc. Collapse must result from a covered peril." (Doc. 89-11, at 1.) On December 7, 2021, Builders Mutual sent a formal letter which cited the policy, stating "[a] covered building or structure or any part thereof that is in danger of falling down or caving in is not considered to be in a state of collapse" and "[a] covered building or structure that is standing or any part of a covered building or structure that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion." (Doc. 89-14, at 1.)

Between Bankston's visit on November 19, 2021, and December 1, 2021, GCC and Tahini decided to remove the entire west wall. (Doc. 89-5, at 11–12.) But, on January 20, 2022, before it or GCC had removed the wall, Tahini terminated the project. (*Id.* at 17.) At the time of the project's termination, the wall was still standing. (*Id.*)

Months later, on June 13, 2022, GCC and Tahini sent a letter disputing Builders Mutual's denial of coverage. (Doc. 89-15, at 1.) They claimed the policy should provide coverage for removal and replacement of the west wall. (*Id.*) For the first time, they asserted that the damage was "caused by collapse of all or part of a building or structure in whole or in part." (*Id.*) They also demanded coverage for Tahini's lost rental profit under an endorsement to the policy. (*Id.* at 1–2.) Tahini and GCC attached an updated report from Cartwright to this letter, in which he stated that the "building sustained direct physical damage and loss as a result of the collapse of an inside existing brick wall on the west side of the building," and "the collapse of the west brick

wall of the building constitutes an abrupt falling down or caving in of the building or structure in whole or in part." (Doc. 89-15, at 12.) Despite the language of the demand letter, however, GCC and Tahini pointed to no evidence that the instability of the wall was caused by the falling of bricks on November 15, 2021. (*Id.*) Nothing in Cartwright's updated report contradicted his earlier conclusion that "unforeseen deterioration only recently uncovered" was to blame. (*Id.*)

Builders Mutual reopened the claim and replied to the letter on June 27, 2022, and requested additional information regarding whether the claim was based on a collapse of the interior west wall or for the exterior west wall. (Doc. 89-3, at 35; Doc. 89-16.) Tahini and GCC replied on July 21, 2022, stating that the claim was related to the exterior west wall "that is in a state of collapse as to all or part of the building or structure and has caused the building in whole or in part to be in a state of collapse." (Doc. 89-17, at 2.) Builders Mutual still did not retain an engineer and did not resolve the claim; instead, it held several meetings and eventually decided to file this declaratory-judgment action. (Doc. 89-2, at 31–33, 47–48.)

### B. Expert Reports

#### i. Matthew G. Richardson

Builders Mutual retained Matthew G. Richardson, a forensic engineer, to provide a report. (Doc. 92-1, at 2.) Richardson reviewed photographs and videos of the exterior west wall taken during the construction, as well as historical Google Street View imagery. (*Id.*) He also reviewed both Cartwright's initial and updated reports. (*Id.* at 4.) He did not visit the building, because it had already been razed. (*Id.* at 2.) In his report, Richardson opined:

- The west wall of the building previously located at 27 West Main Street in Chattanooga, Tennessee was not in a state of collapse when construction activities began.

- The west wall of the subject building was not in a state of collapse after the cutting of the masonry for the window openings and the removal of one of the areas of cut masonry.

- The dislodging of pieces of the interior of the wall assembly during the removal of the cut masonry did not adversely affect the structural integrity of the wall.

- While the internal portions of the wall were not visible from the interior or exterior of the building, the condition of the internal portions of the west wall was predictable/expected due to the wall's exposure to the elements, the age of the wall, and the wall's construction.

- The predictable conditions could have been verified or discounted with exploratory observations prior to design/construction; these conditions could have been included in the planning and design phases.

- The numerous individual exterior bricks in the west wall at various heights that were deteriorated by facial delamination were visible and were present prior to the design and construction phases; these deficiencies were visible on historical Google Street View imagery as far back as 2011.

- The long-term presence of delaminated bricks in the west wall should have prompted further investigation of the structural integrity of the wall during the planning and design phases.

(*Id.* at 5.)

### ii.    *John Speweik*

Builders Mutual also retained John Speweik, a preservation consultant.  (Doc. 92-3, at 1.) Speweik reviewed "reports, photos in the engineers report[, and] video," and he visited the site in January 2023.  (*Id.* at 1.)  He opined that GCC's decision to take out the brick wall was "ill advised" and was "an over-reaction to a self-inflicted injury caused by the lack of understanding of basic historic load-bearing brick wall design."  (*Id.* at 4.)  He also opined that the center wythe of three (exterior, center, and interior) in the brickwork did not "experience deterioration or decay" and that GCC "mistakenly thought the void spaces between the brick on the inner wythe was deterioration."  (*Id.* at 5.)

### iii.    *William Warfel*

GCC and Tahini retained William Warfel, a professor of insurance and risk management at Indiana State University.  (Doc. 96-1, at 1.)  Warfel reviewed the complaint, the builder's risk underwriting questionnaire, a series of emails and letters, the policy itself, Cartwright's updated

report, the deposition of Builders Mutual's claim representative, and the deposition of Builders Mutual's corporate representative. (*Id.* at 23–32.) At issue here, he opined: (1) GCC and Tahini's "risk claim falls within the ambit of the coverage provided"; and (2) Builders Mutual "processed this claim in a manner that was inconsistent with sound claims handling practices in the insurance industry." (*Id.* at 32–36.)

### iv.     *Arch Willingham*

GCC and Tahini also retained Arch Willingham, a general contractor with over thirty-eight-years of experience. (Doc. 97-2, at 15.) Willingham first visited the site on October 4, 2022, and took photographs. (*Id.*) He opined on various aspects of the project, concluding that: (1) "[t]he architectural and structural drawings . . . were reasonable for estimating and building the project"; (2) "[t]he reason for the collapse of the wall was unusual and not something a reasonable contractor (much less a building owner) would have anticipated"; (3) "[t]he method the contractor chose to penetrate the wall was reasonable and ordinary for the industry"; and (4) "[a] plain reading of the [insurance policy sections regarding collapse] by a reasonable contractor would indicate that the cost of the loss should be paid by the insurance carrier." (*Id.* at 16–20.)

### C.     Procedural History

Builders Mutual commenced this action on August 19, 2022. (Doc. 1.) It seeks a declaratory judgment that it is not required to "indemnify, reimburse, compensate or otherwise pay [GCC and Tahini] for the claimed loss and damages." (*Id.* at 9.) Both GCC and Tahini filed counterclaims. (Docs. 18, 19.) In addition to seeking declaratory judgment that "Builders Mutual is obligated to provide coverage for the subject claim under the Policy to include any and all costs of repair, rebuild and/or replacement of the collapsed walls and damages to the Property and all other damages or loss provided for under the Policy," both assert counterclaims for: (1)

breach of contract; and (2) bad-faith denial of an insurance claim under Tennessee Code Annotated § 56-7-105. (Doc. 13, at 15–17, 19–20; *see* Doc. 14, at 8–9.) Tahini also asserts a counterclaim for fraud and misrepresentation. (Doc. 13, at 17–18.)

On September 28, 2023, Builders Mutual filed a motion for summary judgment (Doc. 88); the next day it also filed motions to exclude certain testimony from William Warfel (Doc. 96) and Arch Willingham (Doc. 97). On September 29, 2023, GCC and Tahini filed a joint motion for partial summary judgment on its declaratory-judgment counterclaims (Doc. 94), as well as a joint motion to exclude expert testimony from Matthew G. Richardson and John Speweik (Doc. 92). Lastly, on October 19, 2023, GCC and Tahini filed a joint motion to strike testimony cited by Builders Mutual in support of its motion for summary judgment (Doc. 104). These motions are ripe for the Court's review.

## II.    STANDARD OF REVIEW

### A.    Summary Judgment

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the evidence in the light most favorable to the nonmoving party and makes all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc*., 253 F.3d 900, 907 (6th Cir. 2001).

The moving party bears the burden of demonstrating that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The moving party may meet this burden either by affirmatively producing evidence establishing that there is no genuine issue of material fact or by pointing out

the absence of support in the record for the nonmoving party's case. *Celotex*, 477 U.S. at 325. Once the movant has discharged this burden, the nonmoving party can no longer rest upon the allegations in the pleadings; rather, it must point to specific facts supported by evidence in the record demonstrating that there is a genuine issue for trial. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002).

At summary judgment, the Court may not weigh the evidence; its role is limited to determining whether the record contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A mere scintilla of evidence is not enough; the Court must determine whether a fair-minded jury could return a verdict in favor of the non-movant based on the record. *Id.* at 251–52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If not, the Court must grant summary judgment. *Celotex*, 477 U.S. at 323.

### B. Federal Rules of Evidence 702 and 703

Federal Rules of Evidence 702 and 703 govern the admissibility of testimony by expert witnesses. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. According to Rule 703, an expert is permitted to base her opinion on facts or data of which she has been made aware or has personally observed. Fed. R. Evid. 703. The underlying facts or data need not be admissible for the opinion to be admitted, so long as an expert in the field would reasonably rely on them in forming an opinion on the subject. *Id.*

The Sixth Circuit has identified three requirements for an expert's testimony to be admissible under Rule 702: (1) "the witness must be qualified by knowledge, skill, experience, training, or education"; (2) "the testimony must be relevant, meaning that it will assist the trier of fact to understand the evidence or to determine a fact in issue"; and (3) "the testimony must be reliable." *Burgett v. Troy-Bilt, LLC*, 579 F. App'x 372, 376 (6th Cir. 2014) (citing *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008)) (internal quotation marks omitted). With respect to the first requirement, courts consider whether the qualifications "provide a foundation for a witness to answer a specific question," as opposed to considering his or her qualifications in the abstract. *Id.* (citing *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)). The party offering the expert testimony must prove the expert's qualifications by a preponderance of the evidence. *Id.* (citing *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478 (6th Cir. 2008)).

Reliability, the third requirement, is assessed by the factors set out in Rule 702 itself— whether the testimony is based on sufficient facts or data, whether the testimony is the product of reliable principles and methods, and whether the principles and methods used were reliably applied. *In re Scrap Metal*, 527 F.3d at 529 (citing Fed. R. Evid. 702). The focus is on reliability rather than "credibility and accuracy." *Superior Prod. P'ship v. Gordon Auto Body Parts Co., Ltd.*, 784 F.3d 311, 323 (6th Cir. 2015) (quoting *In re Scrap Metal*, 527 F.3d at 529). Thus, courts should focus on the methodology employed rather than the conclusions drawn. *Id.*; *see Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993). In determining whether expert testimony "is the product of reliable principles and methods," Fed. R. Evid. 702(c), courts may consider whether the methods and principles have been and are capable of being tested, whether they have been subjected to peer review and publication, their known or potential rate of

error, and whether they are generally accepted within the relevant scientific community. *See Daubert*, 509 U.S. at 593–94; *see also United States v. Mallory*, 902 F.3d 584, 592–93 (6th Cir. 2018) (noting that all of the factors do not necessarily apply in every case). The inquiry, however, is flexible, and the district court may also consider other factors that bear on the reliability of the expert's testimony. *See Kuhmo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149–50 (1999) ("[A] trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony."). A rebuttal expert may provide contrasting expert opinions or challenge the methodology utilized by the opposing party's experts in arriving at his conclusions. *E.E.O.C. v. Tepro, Inc.*, 133 F. Supp. 3d 1034, 1048 (E.D. Tenn. 2015).

"[R]ejection of expert testimony is the exception rather than the rule," and "Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact." *Burgett*, 579 F.3d at 376 (citations omitted) ("*Daubert* did not work a seachange over federal evidence law, and the trial court's role as a gatekeeper is not intended to serve as a replacement for the adversary system.").

A district court may, but need not, hold an evidentiary hearing to aid in the decision of whether to grant a *Daubert* motion. *See Kuhmo*, 526 U.S. at 152 ("The trial court must have the same kind of latitude in deciding *how* to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides *whether or not* that expert's relevant testimony is reliable." (emphasis in the original)); *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 249 (6th Cir. 2001).

### III.    ANALYSIS

Builders Mutual moves for summary judgment on its claim for declaratory judgment, on GCC and Tahini's counterclaims for breach of contract and bad faith, and on Tahini's counterclaim for fraud and misrepresentation.  (Doc. 88.)  GCC and Tahini jointly move for partial summary judgment on their counterclaims for declaratory judgment.  (Doc. 94.)  Builders Mutual also moves to exclude portions of expert testimony from William Warfel (Doc. 96) and Arch Willingham (Doc. 97).  GCC and Tahini jointly move to exclude the expert testimony of Matthew G. Richardson and John Speweik (Doc. 92) and to strike testimony cited by Builders Mutual in support of its motion for summary judgment (Doc. 104).

### A.    *Daubert* Motions

#### i.    *Matthew G. Richardson*

GCC and Tahini argue that the Court should exclude Richardson's opinion "about the collapse of the wall or the cause of the collapse" because his methods are "not reliable and are not supported by any engineering analysis or methodologies."  (Doc. 93, at 5.)  They argue that Richardson only relied on photographs, videos, and Google Street View images—some being more than two years old when he created the report—instead of other reports, data or testimony. (*Id.* at 9.)

A court's role is only to determine whether an expert's testimony is reliable, not whether it is accurate or credible.  *In re Scrap*, 527 F.3d at 529–30.  A court must determine whether an expert's opinion rests on a "reliable foundation" rather than "unsupported speculation."  *Id.* Even expert testimony based on erroneous facts is generally permitted "when there is some support for those facts in the record."  *Id.* at 530.  Expert testimony based on "shaky" evidence is admissible, so long as the testimony is not based on "guesses" or "assumptions."  *Jahn v. Equine*

*Servs., PSC*, 233 F.3d 382, 393 (6th Cir. 2000). However, a "court is not required to admit expert testimony 'that is connected to existing data only by [an assertion without proof] of the expert'" and "may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Nelson v. Tenn. Gas Pipeline Co.,* 243 F.3d 244, 254 (6th Cir. 2001) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

In this case, Richardson's opinions are reliable and supported by sufficiently related data. Richardson relied on photographs, videos, Google Street View images, and Cartwright's report in forming his opinions. (Doc. 92-1, at 2, 4.) From this data, Richardson observed specific characteristics of the building, such as mortar coating, removal of the roof covering, and installation of lateral bracing. (*Id.*) He then noted how some of these characteristics affected the building and why a builder should expect that the wall at issue would be compromised given these characteristics. (*Id.* at 4–5.) He also noted from comparing new and old images that there was "no differential movement of the wall after the cutting of the window openings." (*Id.* at 5.) GCC and Tahini point out that some of the Google Street View images were more than two years old when Richardson examined them. (Doc. 93, at 9.) But this does not make Richardson's opinions unreliable; in fact, Richardson's conclusions note these considerations, as he compared images of the building before window cuts and images of the building after the window cuts. (Doc. 92-1, at 3–4.)

GCC and Tahini also argue that Richardson did not rely on "other reports,"[5] witness testimony, or industry data in preparing his opinions. (Doc. 93, at 9.) But these are potential limitations to his report, the weight of which can decided by a jury, not fatal flaws rendering his

---

[5] Presumably, this means that Richardson only looked at Cartwright's report, since Richardson's report states that he considered Cartwright's report. (Doc. 92-1, at 4.)

report inadmissible.  Richardson reviewed data—in the form of pictures, videos, Google Street View Images, and Cartwright's report—and drew conclusions specifically based on his observations from this data.[6]  This is all that is required for an expert opinion to be reliable and based on sufficient data.

Nonetheless, Richardson's first two opinions—that the wall "was not in a state of collapse when construction activities began" and that the wall "was not in a state of collapse after the cutting of the masonry for the window openings and the removal of one of the areas of cut masonry"—are inadmissible because both impermissibly interpret the contract at issue.  "Absent any need to clarify or define terms of art, science, or trade, expert opinion testimony to interpret contract language is inadmissible."  *See N. Am. Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1281 (6th Cir. 1997) (citations omitted).  In this case, "collapse" and "state of collapse" are terms defined by the policy at issue.  Concluding that the wall was in a "state of collapse" necessarily required Richardson to interpret "collapse" under the policy at issue, and, because "collapse" is not a term of art, science, or trade, Richardson's testimony opining on whether a "collapse" occurred under the policy, impermissibly interprets contractual language.

Further, several of Richardson's conclusions are irrelevant because they opine on what GCC and Tahini should have known regarding "decay" of the building—not what they did know.  The policy provides that Builders Mutual will pay for "direct physical loss or damage to Covered Property, caused by collapse . . . caused by . . . [d]ecay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse."  (Doc. 89-10, at 8.)  Tennessee law does not define whether the term "known" in this provision requires actual

---

[6] Richardson testified that his preference is to conduct a site visit, if possible, but, in this case, the wall was already destroyed.  (Doc. 102-1, at 8.)  This also goes to the weight of the evidence rather than admissibility.

knowledge or constructive knowledge. While some courts outside Tennessee have interpreted this provision to require only constructive knowledge, *see, e.g.*, *Cnty. of Del. v. Travelers Property Cas. Co. of Am.*, 559 F. Supp. 3d 425, 436 (E.D. Penn. 2021) (interpreting identical insurance provision under Pennsylvania law and noting "[t]he test is objective—whether a reasonable insured under the same circumstances would have seen or otherwise been aware of the decay") (citations omitted); *Young Sook Pak v. Alea London Ltd.*, No. 1:08-CV-0824, 2009 WL 2366549, at *8 (M.D. Penn. July 30, 2009) (applying Pennsylvania law to identical insurance provision and expanding that "[w]hile an insured need not affirmatively inspect the insured premises so as to uncover otherwise hidden decay and repair it before it worsens, he likewise cannot retreat to willful blindness or refusal to draw those conclusions a reasonable insured would draw from visible signs of deterioration or decay") (citations omitted), neither party here asserts that constructive knowledge is the appropriate standard and instead focuses on actual knowledge (Doc. 90, at 18–19 (Builders Mutual arguing points such as GCC and Tahini "had knowledge that the west wall had notable deterioration prior to work beginning," "were aware of the significant deterioration of the west wall prior the alleged collapse," and were "well aware of 'such decay' prior to the alleged 'collapse'")); (Doc. 103, at 4–6 (GCC and Tahini arguing that the decay was "hidden" and "unknown")). Because the parties focus on actual knowledge, the Court will apply an actual-knowledge standard.

Given this actual-knowledge standard, Richardson's following opinions are irrelevant: "[w]hile the internal portions of the wall were not visible from the interior or exterior of the building, the condition of the internal portions of the west wall was predictable/expected due to the wall's exposure to the elements, the age of the wall, and the wall's construction"; "[t]he predictable conditions could have been verified or discounted with exploratory observations

prior to design/construction[, and] these conditions could have been included in the planning and design phases"; and "[t]he long-term presence of delaminated bricks in the west wall should have prompted further investigation of the structural integrity of the wall during the planning and design phases." These opinions relate to what GCC and Tahini should have known, not what they actually knew. And what GCC and Tahini should have known is of no consequence in determining whether they had actual knowledge of the decay.

As a result, only two of Richardson's opinions remain: that (1) "[t]he dislodging of pieces of the interior of the wall assembly during the removal of the cut masonry did not adversely affect the structural integrity of the wall"; and (2) "[t]he numerous individual exterior bricks in the west wall at various heights that were deteriorated by facial delamination were visible and were present prior to the design and construction phases[, and] these deficiencies were visible on historical Google Street View imagery as far back as 2011." Neither of these conclusions opines on the ultimate legal issue of "collapse." The first conclusion is relevant to GCC and Tahini's argument that the wall's lack of structural integrity constitutes a "collapse" and determining the effect the falling bricks had on the west wall's structural integrity. The second conclusion is potentially relevant to GCC and Tahini's knowledge of decay.[7] Therefore, because these opinions are relevant to the dispute, and because Richardson's opinions satisfy the *Daubert* factors as discussed above, these two opinions are admissible.

Accordingly, the Court will grant in part and deny in part GCC and Tahini's motion to exclude Richardson's opinions (Doc. 92). Richardson may testify as to his opinions that "[t]he dislodging of pieces of the interior of the wall assembly during the removal of the cut masonry

_____

[7] As discussed below, the undisputed facts demonstrate the "collapse" was caused by *interior* decay and Richardson's opinion deals with *exterior* decay. Nonetheless, the Court will discuss the evidence of exterior decay below.

did not adversely affect the structural integrity of the wall" and "[t]he numerous individual exterior bricks in the west wall at various heights that were deteriorated by facial delamination were visible and were present prior to the design and construction phases; these deficiencies were visible on historical Google Street View imagery as far back as 2011."

### ii. *John Speweik*

GCC and Tahini also move to exclude Speweik from offering "any testimony, opinions[,] or reports." (Doc. 93, at 15.) Specifically, they seek to exclude his "opinion that a collapse occurred" (*id.* at 9–10), any "testimony regarding potential defects in contracting, engineering, or architectural work" (*id.* at 10), and any "testimony and/or opinions concerning [contracting, engineering, or architectural work], their planning and design on this project, along with the cause, origin, circumstances and nature of the collapse and/or structural integrity of the wall, walls and building that is the subject of the policy in this dispute" (*id.* at 11). They argue that Speweik is not qualified to offer expert opinions, that his methodology is unreliable, and that his testimony does not meet the *Daubert* factors. (*Id.* at 9–11.)

First, GCC and Tahini argue that Speweik is unqualified to opine whether the wall "collapsed." (*Id.* at 9–10.) But Speweik does not appear to do so. Speweik's report refers to the building's "collapse" when it states he was scheduled to conduct an onsite inspection on January 12, 2023, but the third floor "collapsed" into the street prior to that inspection. (Doc. 92-3, at 1.) This is not the collapse at issue in this case, and it occurred after the litigation began. He also opined that, when the contractors made the window cuts, the header brick "collapsed." (Doc. 92-3, at 4.) Speweik appears to be using the term "collapsed" in a layman's sense as meaning "fell," as opposed to offering an expert opinion that there was or was not a "collapse" within the meaning of the policy. Therefore, Speweik may explain why he did not inspect the building in

person and may explain the context of the fallen bricks. Given this is a bench trial, there is no risk of confusion to a jury.

Further, GCC and Tahini argue that Speweik's qualifications are insufficient to be an expert witness because he does not possess a degree in architecture, is not a licensed general contractor, is not a professional engineer, has no certification in accident reconstruction, and has never been involved in a case concerning whether a building collapsed under an insurance policy. (Doc. 93, at 9–10.) "The issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for the witness to answer a specific question." *Berry*, 25 F.3d at 1351. As Rule 702 states "a witness [can be] qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702.

In this case, Speweik is qualified to testify on characteristics of historic buildings—specifically masonry work—and those characteristics' effects. He has nearly thirty-five years of masonry experience and has consulted on over 1,500 projects specifically involving historic masonry—500 of which involved buildings on the National Historic Registry. (Doc. 92-4, at 22–23.) Given that Speweik's opinions involve the historic construction, design, and materials of the building, his extensive experience working in historic masonry qualifies him to opine on these aspects of a historic, brick building.

GCC and Tahini next argue that Speweik's methodology is irrelevant and unreliable. (Doc. 93, at 11.) Speweik, they argue, did not base his report on evidence that concerned the wall at issue, as the mortar he tested was from the back exterior wall rather than the west exterior wall—the wall at issue. (*Id.*) They also argue that there is a chain-of-custody issue regarding the mortar because Speweik mailed the material to a third-party organization, and the third-party

organization did not send any information confirming that the mortar it tested was the mortar Speweik sent for testing. (*Id.* at 12–13.) First, this testing is almost entirely irrelevant to Speweik's conclusions; the results of this testing only support his conclusion that the mortar was "consistent with buildings built in 1900." (Doc. 92-3, at 5.) Second, these are questions of credibility and not reliability. GCC and Tahini present no evidence that the mortar on the exterior back wall would be markedly different from that on the exterior west wall. Nor do they present any evidence that the third-party organization tested the wrong mortar. Even so, experts need not rely on admissible evidence for their opinions to be admissible. *See* Fed. R. Evid. 703 ("If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."); (Doc. 92-4, at 12 (Speweik testifying that he sends mortar to the third-party organization for testing "[d]ozens of times a year").)

Lastly, GCC and Tahini argue that the *Daubert* factors have not been satisfied. (Doc. 93, at 11.) However, the factors they cite—the testability of the expert's hypothesis, whether the expert's methodology has been subjected to peer review, the rate of error associated with the methodology, and whether the methodology is generally accepted within the scientific community—are unhelpful in this case because Speweik's opinions are based on his specialized knowledge in historical masonry rather than a scientific methodology. *See First Tenn. Bank. Nat. Ass'n v. Barreto*, 268 F.3d 319, 334 (6th Cir. 2001) ("[T]he four specific factors utilized in *Daubert* may be of limited utility in the context of non-scientific expert testimony. . . . If the *Daubert* framework were to be extended to outside the scientific realms, many types of relevant and reliable expert testimony—that derived substantially from practical experience—would be excluded.") (internal quotations and alterations omitted). Speweik's specialized knowledge in

historical masonry assists the trier of fact in understanding the structure of a historic brick building and is therefore admissible.

Again, like Richardson, Speweik may not testify as to whether the wall "collapsed" under the terms of the insurance policy, although he does not appear to have opined on this issue. As discussed above, an expert conclusion that the wall "collapsed" under the terms of the policy requires impermissible contractual interpretation.

Accordingly, the Court grants in part and denies in part GCC and Tahini's motion to exclude Speweik's testimony (Doc. 92). Speweik may not testify as to whether the wall was in a state of "collapse" under the policy—which he does not appear to have opined upon. Speweik may testify about defects in the building; the planning and design on this project; and the cause, origin, circumstances and nature of the collapse and structural integrity of the wall.

### iii. William Warfel

Builders Mutual moves to exclude Warfel's opinions regarding the interpretation of policy language and conclusions of law on the ultimate issues in the case. (Doc. 96.) Regarding contractual language, "[a]bsent any need to clarify or define terms of art, science, or trade, expert opinion testimony to interpret contract language is inadmissible."[8] *N. Am. Specialty Ins. Co.*, 111 F.3d at 1281 (citations omitted).

In this case, Warfel's opinion that GCC and Tahini's "claim falls within the ambit of coverage provided under the applicable [policy]" as well as his opinion of what "collapse" means in the context of the policy impermissibly interprets the policy at issue. Warfel's opinions directly state what "part of a building," "decay," "partial collapse," and other terms mean under

---

[8] The Court will discuss whether the language is "ambiguous" below. *See infra* Section III.B.i.a. Warfel's testimony will not aid in assisting the jury, because the language of contracts and the parties' intent is a question of law. *See German*, 300 S.W.3d at 701.

the policy, that the submitted claim fell within the policy, and that "Builders Mutual wrongfully concluded that a partial collapse was not covered under the Policy." (Doc. 96-2, at 32; Doc. 96-3, at 6–8.) All such opinions impermissibly interpret the contractual language at issue by either directly defining terms in the policy or by interpreting the policy's definition of "collapse" to conclude that a "collapse" occurred under the policy. Therefore, his opinions regarding interpretation of the policy's language and conclusions regarding application of the policy are inadmissible.

Accordingly, the Court grants Builders Mutual's motion to exclude certain testimony from Warfel regarding the interpretation of policy language and conclusions of law on the ultimate issue in the case (Doc. 96).

### iv.    *Arch Willingham*

Builders Mutual also moves to exclude Arch Willingham's opinion regarding insurance coverage. (Doc. 97.) It argues that Willingham does not have the requisite education or background in insurance to opine on "the applicable insurance coverage [and] the subject insurance policy and the customs and practices of the insurance industry." (*Id.* at 1.)

Because Willingham does not possess specialized knowledge regarding insurance policies, he cannot opine as to the insurance policy at issue or the customs or practices of the industry. GCC and Tahini nonetheless argue that Willingham is qualified to provide these opinions because he is a trained and licensed general contractor. (Doc. 101, at 1.) GCC and Tahini also note that Willingham has worked on similar projects in the Chattanooga area. (Doc. 101, at 5.) At one point Willingham opines "[a] plain reading of the policy sections above by a reasonable contractor would indicate the cost of loss should be paid by the insurance carrier" and that Builders Mutual "refused to live up to their end of the bargain and refused to pay the

claim."[9]  Such opinions are too far removed from Willingham's specialized knowledge as a contractor.

Essentially, GCC and Tahini ask the Court to conclude that, because Willingham regularly purchases a product, he is an expert on that product.  The Court disagrees with this reasoning.  General contractors buy a variety of products and services—heating and cooling services, framing, electrical services, insurance, and plumbing to name a few.  But they are not necessarily experts in any individual product or service.  By way of example, a restaurant chef who buys fresh fish daily for his kitchen might be aware of fishing customs, he is certainly aware of types of fish, and he might be aware of what quality of fish a similar chef would expect from a fisherman.  But he would not be an expert fisherman.  Likewise, Willingham's involvement with insurance policies might give him familiarity with types of insurance or even the purpose of certain clauses, but his experience does not make him an expert on insurance provisions.  He possesses no specialized knowledge beyond the "use and purchase" of insurance.  (Doc. 101, at 4.)  Therefore, he is not qualified to opine about whether an insurance provision covers a specific circumstance.

Further, no amount of education or specialized knowledge could make Willingham's conclusion regarding policy coverage admissible, because whether there is coverage under the policy is a legal conclusion.  Willingham's report cites the policy provisions and applies the facts of this case to conclude that "[a] plain reading of the policy sections above by a reasonable contractor would indicate that the cost of the loss should be paid by the insurance carrier."  (Doc.

---

[9] Willingham's conclusion regarding what a "reasonable contractor" would think the insurance policy covers is also inadmissible for another reason:  it does not assist the trier of fact.  The standard for interpreting a contract is not what one party thinks a contract means or what a reasonable professional thinks a contract means.

97-2, at 20.)  This is a question for the jury and the Court, not for a witness.  Therefore, Willingham's opinion on this issue is inadmissible.

Accordingly, the Court grants Builders Mutual's motion to exclude certain opinions of Willingham regarding insurance coverage (Doc. 97).

**B.    GCC and Tahini's Motion to Strike (Doc. 104)**

GCC and Tahini jointly move to exclude testimony cited by Builders Mutual in support of its motion for summary judgment (Doc. 104).  Specifically, GCC and Tahini seek to exclude the following testimony from insurance adjuster, Greg Bankston:

> Q.    Okay.  What is your definition of "collapsed"?
>
> A.    Well, my definition of it is something's got to actually have fallen.
>
> Q.    All of it?
>
> A.    Not all of it.  You can have a partial collapse.  But you didn't have a partial collapse here.  You had an unstable wall that was 100 years old, and that's exactly what even the general contractor told me when I called and when I went out there.
>
> Q.    Told you what?
>
> A.    "The wall hasn't fallen.  We're cutting into the brick.  We're afraid it's unstable.  We're not proceeding any further."
>
> Q.    Is that what they said to you?
>
> A.    That is what they said to me.
>
> Q.    Okay.  So they didn't say whether it was collapsed or not?
>
> A.    No, they did not.  They said it – no.  They said, "It has not collapsed."  I believe it was Mitchell that I met with out there on the 19th.

(*Id.* at 1–2: Doc. 89-8, at 7–8.)

GCC and Tahini argue that this testimony constitutes inadmissible hearsay.  (Doc. 104, at 2.)  "[T]he hearsay rule bans in-court repetition of extrajudicial utterances only when they are offered to prove the truth or falsity of their contents."  *United States v. Gibson*, 675 F.2d 825, 834 (6th Cir. 1982) (citation omitted).

In this case, Bankston's testimony is not necessarily hearsay. While the statement is undoubtably made outside of court, it is possible that Builders Mutual could offer it for a reason other than to prove the truth of the matter asserted. Bankston's statement could not be used to prove that the wall was one-hundred years old, that the wall was unstable, or that the wall did not "collapse" under the policy. But it can be used to prove that Bankston informed Builders Mutual that the wall had not collapsed or what GCC told Bankston when he investigated. And these are the propositions for which Builders Mutual cites this testimony in its briefing. (Doc. 90, at 5–6 (citing this testimony in support of the assertion that "Bankston reported to Builders Mutual that the wall had not collapsed"), 17–18 (citing this testimony in support of the assertion that a GCC employee told Bankston the that the wall was unstable during his inspection)[10].)

Accordingly, the Court denies GCC and Tahini's motion to strike this testimony (Doc. 104). As is apparent below, this decision does not impact the Court's analysis regarding coverage. At trial, the Court will consider appropriate objections to such testimony, depending upon the circumstances.

### C. Summary-Judgment Motions

Builders Mutual moves for summary judgment on its declaratory-judgment claim, on GCC and Tahini's breach-of-contract and bad-faith counterclaims, and on Tahini's fraud-and-misrepresentation counterclaim. (Doc. 88.) GCC and Tahini move for partial summary judgment on their declaratory-judgment counterclaims. (Doc. 94.)

---

[10] Additionally, the latter statement is not hearsay, because it is a statement offered against an opposing party that was made by the party's employee on a matter within the scope of the relationship and while it existed. *See* Fed. R. Evid. 801(d)(2)(D). Mitchell McBee—GCC's project manager on the building—told Bankston about the issue with the wall. (Doc. 110-3, at 4.) McBee was GCC's employee, and the statement was within the scope of his employment as it concerned the project. Because this statement is offered against GCC, it is not hearsay.

### i. *Declaratory Judgment*

Builders Mutual moves for summary judgment on its declaratory-judgment claim and asks the Court to enter "a declaratory judgment that Builders Mutual is not obligated to indemnify [GCC and Tahini] for the alleged collapse of the west wall or a portion of the west wall [of the building], because the applicable Builders Mutual policy does not provide coverage for the alleged 'collapse' and/or the alleged 'collapse' is excluded from coverage." (Doc. 88, at 1.) Conversely, GCC and Tahini jointly move for summary judgment on their declaratory-judgment counterclaims, asking the Court to enter judgment that: (1) "any ambiguity or inconsistency in the Policy, particularly with regard to coverage for a 'collapse,' must be construed against Builders Mutual, as the drafter of the Policy, and in favor of the insured, GCC and Tahini"; (2) "GCC and Tahini, as the insured and additional insured, paid the premium for coverage under the Policy, that the loss on November 15, 2021 occurred within the applicable Policy period and that the loss at 27 West Main was covered Property"; (3) "the loss constitutes a 'collapse,' as defined by the Policy and by Tennessee law"; (4) "the loss constitutes a 'collapse' based on the undisputed testimony in the record from the site supervisor, engineer and Builders Mutual representative"; and (5) "Builders Mutual denied and maintained the denial of the claim under the 'collapse' provision of its Policy—contending there was no 'collapse' or collapse by 'covered peril'—without any reservation or assertion of other provision or exclusions of the Policy, and as such Builders Mutual has waived and should be estopped from now retroactively raising or asserting any other provisions of the Policy as a basis for its denial of this claim." (Doc. 94, at 4–5.)

GCC and Tahini's first two sought declarations are not disputed; as a matter of law, all ambiguities are construed against the drafter of an insurance policy, and Builders Mutual does

not argue that Tennessee law provides otherwise or that it did not draft the policy. *See Garrison v. Bickford*, 377 S.W.3d 659, 663–64 (Tenn. 2012). Instead, Builders Mutual argues the policy is not ambiguous. Second, Builders Mutual does not dispute that GCC and Tahini paid the premium under the policy, that any loss that occurred took place within the policy period, or that the building was covered property. Rather, it disputes that a "collapse" occurred under the policy.

The declaration Builders Mutual seeks as well as the third and fourth declarations GCC and Tahini seek require the Court to determine whether there is coverage under the policy. Therefore, the Court will address the cross motions for summary judgment on the declaratory-judgment claims and counterclaims together.

> a. What is Covered Under the Policy?

Preliminarily, Tennessee choice-of-law principles in insurance cases require the Court to "apply the substantive law of the state in which the policy was issued and delivered." *Standard Fire Ins. Co. v. Chester O'Donely & Assoc., Inc.*, 972 S.W.2d 1, 5 (Tenn. Ct. App. 1998) (citations omitted). In this case, there is no dispute that the policy was issued and delivered in Tennessee, and, therefore, the Court applies Tennessee law. (Doc. 89-10, at 3.)

In Tennessee, it is "well-established . . . that '[i]nsurance policies are, at their core, contracts.'" *Garrison*, 377 S.W.3d at 663–64 (citation omitted). Courts therefore "interpret insurance policies using the same tenets that guide the construction of any other contract." *Id.* (citation omitted). "[T]he terms of an insurance policy should be given their plain and ordinary meaning, for the primary rule of contract interpretation is to ascertain and give effect to the intent of the parties." *Id.* (quotation marks and citation omitted). "[T]he language in dispute should be

examined in the context of the entire agreement" to ensure a reasonable construction of the whole policy. *Id.* (citations omitted).

"[C]ontracts of insurance are strictly construed in favor of the insured, and if the disputed provision is susceptible to more than one plausible meaning, the meaning favorable to the insured controls." *Id.* (citation omitted). But "a strained construction may not be placed on the language used to find ambiguity where none exists." *Id.* (quotation marks and citation omitted).

The policy covers "direct physical loss" to "Covered Property" resulting from a "Covered Cause of Loss." (Doc. 89-10, at 7.) The policy defines "Covered Property" as "[p]roperty which has been, or is intended to become a permanent part of any structure on the Declarations Page under the provisions of [the] policy." (*Id.*) The declarations page in the policy lists 27 West Main Street in Chattanooga as the construction premise for the policy. (*Id.* at 3.) Therefore, the building at issue is "Covered Property."

Given that the building is "Covered Property," the policy covers "direct physical loss" to the building that results from a "Covered Cause of Loss." (Doc. 89-10, at 7.) At issue here, one such "Covered Cause of Loss" is "Collapse." (*Id.* at 8 (covering "direct physical loss . . . to Covered Property, caused by collapse of all or part of a building or structure caused by . . . [d]ecay that is hidden from view, unless the presence of such decay is known to an insurer prior to collapse").) The "Collapse" provision also provides the following:

    (a) Collapse means an abrupt falling down or caving in of a covered building or structure in whole or in part;

    (b) A covered building or structure or any part thereof that is in danger of falling down or caving in is not considered to be in a state of collapse;

    (c) A part of a covered building or structure that is not standing is not considered to be in a state of collapse even if it has separated from another part of the building or structure;

    (d) A covered building or structure that is standing or any part of a covered building or structure that is standing is not considered to be in a state of

collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

(*Id.*)  In sum, as relevant here, the policy covers "direct physical loss" that is caused by "collapse" if that "collapse" is caused by decay that is both hidden and unknown.  (*Id.*)

GCC and Tahini argue a "collapse occurred" because there was "an abrupt falling down of the brick once the first window cut was made" on November 15, 2021.  (Doc. 95, at 27.)  But GCC and Tahini do not argue that the entire wall abruptly fell under the policy.  Rather, they argue that the portion of the wall that was still standing was structurally impaired and that the policy's definition of "collapse" should also mean "substantial impairment of the structural integrity of the building or any part of the building."  (Doc. 95, at 21.)  Under the policy, a "collapse" can occur to all or only "part of a building."  (Doc. 89-10, at 8 (covering "collapse of all *or part* of a building of structure") (emphasis added).)  Therefore, part of a structure might "collapse" while another part of that same structure might not "collapse."  Yet, both parties frame whether the exterior west wall is covered as a binary outcome:  either the entire wall "collapsed" and is covered by the policy or the entire wall did not "collapse" and is not covered by the policy.  (*See, e.g.*, Doc. 90, at 13 (arguing "a wall must abruptly fall down to be a collapse")); (Doc. 95, at 31 (arguing "a collapse of the west wall of the building occurred").)

Such an approach does not square with the language of the policy.  Because coverage of a particular loss depends on whether the cause of the loss is a "Covered Cause of Loss," the Court will consider these disputed losses in turn:  (1) the loss represented by the bricks that fell from the wall when the cut was made on November 15, 2021; (2) the loss associated with removal and replacement of the portion of the wall that remained standing after the bricks fell; and (3)

Tahini's lost rental profit.[11]  For each "direct physical loss" to be covered, it must have been caused by a "collapse" and that "collapse" must have been caused by hidden, unknown decay.

### 1.      Replacement of Bricks that Fell on November 15, 2021

The Court begins with the alleged "direct physical loss" related to the bricks that fell from the wall when the first cuts were made on November 15, 2021.  First, the Court must determine whether this "direct physical loss" was caused by a "collapse."  Applying subsection (a) of the "collapse" provision, part of the covered structure—the bricks on the exterior west wall—abruptly fell and therefore "collapsed" under the policy.  Subsections (b) and (d) do not apply, because the bricks were not in danger of falling as subsection (b) provides or standing as subsection (d) provides.  Instead, the bricks fell and were not standing.  (Doc. 89-7, at 9.)  But applying subsection (c), the bricks were not standing, and subsection (c) states that a part of a structure that is not standing "is not considered to be in a state of collapse."  (Doc. 89-10, at 8.)  Therefore, under subsection (c), the fallen bricks do not constitute a "collapse" under the policy.  Because subsections (a) and (c) provide contradictory outcomes, the policy is ambiguous as to whether the fallen bricks constitute a "collapse."

Once a court determines that language of a contract is ambiguous, it "applies established rules of construction to determine the parties' intent." *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002).  "'Only if ambiguity remains after the court applies the pertinent rules of construction does [the legal meaning of the contract] become

---

[11] Builders Mutual does not dispute that any of these three losses were "direct physical losses." GCC and Tahini claim the building sustained "direct physical loss" in the form of "the removal and replacement of the exterior west wall of the structure in the amount of $614,225.00" and that Tahini "sustained the loss of rental profit as endorsed on the Policy in the amount of $465,000.00."  (Doc. 89-15, at 2.)

a question of fact' appropriate for a jury." *Id.* (quoting *Smith v. Seaboard Coast Line R.R. Co.*, 639 F.2d 1235, 1239 (5th Cir. 1981)).

GCC and Tahini argue that the parties intended "to provide builder's risk insurance for a peril such as the collapse of the building," and this intent, coupled with the ambiguity, requires coverage under the policy. (Doc. 95, at 17.) The Court agrees that the parties intended to insure the building in the event of a "collapse"; however, construing this intent as providing coverage for the fallen bricks does not mean blindly providing coverage without defining "collapse."

When "collapse" is not defined in an insurance policy, Tennessee courts have held such coverage provisions "provide coverage if there is substantial impairment of the structural integrity of the building or any part of a building." *Rankin ex rek. Rankin v. Generali-U.S. Branch*, 986 S.W.2d 237, 238 (Tenn. Ct. App. 1998) (collecting cases). In *Rankin*, the Tennessee Court of Appeals interpreted the meaning of "collapse" in an insurance policy. *Id.* at 238. The policy at issue did not define collapse. *Id.* The court adopted the approach followed by the majority of jurisdictions, concluding that "'collapse' does not require complete destruction or falling in of the building," and, rather, such provisions "provide coverage if there is a substantial impairment of the structural integrity of the building or any part of the building." *Id.* (quoting *Indiana Ins. Co. v. Liaskos*, 697 N.E.2d 398, 404 (Ill. 1998)).

In this case, due to the contradicting definition of "collapse," the policy is effectively left without a definition. Since the policy is effectively left without a definition and since the parties intended to cover a "collapse," the Court will apply a definition of "collapse" from case law interpreting "collapse" when the policy does not define the term. Regardless of whether the Court adopts the *Rankin* definition of "collapse" as meaning "substantial impairment of the structural integrity of . . . any part of the building" or the minority approach that a complete

falling is required, the bricks that fell off the building on November 15, 2021, constitute a collapse of part of the building because, under the *Rankin* approach, the portion of the wall that actually fell was substantially impaired and, because, under the minority approach requiring complete falling, the bricks fell off the wall. Therefore, the fallen bricks constitute a "collapse" under the policy.

Given that the fallen bricks constitute a "collapse," the next issue is whether unknown decay that was hidden from view caused the collapse. (Doc. 89-10, at 8.) The undisputed material facts demonstrate that the decay was both hidden and unknown to Tahini and GCC. Cartwright's revised report stated that the fallen bricks were "caused by decay that was hidden from view or discovery based on the internal nature of the inside or internal aspect of the brick wall." (Doc. 89-15, at 12.) Builders Mutual argues that GCC and Tahini knew of this decay and, therefore, the collapse was not caused by hidden decay. (Doc. 90, at 18.) But Builders Mutual provides no evidence to rebut Cartwright's conclusion that hidden, unknown decay caused the bricks to collapse. It instead provides evidence that GCC and Tahini knew of the decay because they knew of "spalling" brick and the weakened structural integrity of the exterior of the wall. (Doc. 90, at 18–20.) But this "spalling" brick and weakened structural integrity have to do with the *exterior* of the wall, not the *interior* of the wall. Because the decay that caused the collapse was from the interior of the wall, there is no evidence that GCC and Tahini knew of this decay.[12] (Doc. 89-15, at 12.)

---

[12] Perhaps a reasonable jury could conclude that the visible exterior deterioration should have put GCC and Tahini on notice that the interior of the wall contained decay. But, as discussed above, the Court applies an actual-knowledge standard, not a constrictive-knowledge standard. And there is no evidence that GCC and Tahini knew of the interior decay that the undisputed facts demonstrate caused the collapse of the exterior brick.

Because this internal decay that was hidden from view caused the bricks to "collapse," and the "collapse" caused the "direct physical loss" of the fallen bricks, the bricks which fell on November 15, 2021, represent a covered loss under the policy.

> 2. *Removal and Replacement of Structurally Impaired Portion of Wall that Remained Standing After Bricks Fell on November 15, 2021*

The claimed loss of the structurally unsound remaining portion of the exterior west wall after the bricks fell on November 15, 2021, is not covered under the policy. This "direct physical loss" is covered under the policy if either: (1) the structural unsoundness of the remaining portion of the wall itself constitutes a "collapse" and that "collapse" was caused by hidden decay; or (2) the fallen brick caused the remaining portion of the wall to become structurally unsound, since the fallen brick was, as explained previously, a "collapse" caused by hidden, unknown decay.

First, the structural unsoundness of the remaining wall itself is not a "collapse" under the policy. Under subsection (a) of the "collapse" provision, the wall did not abruptly fall down or cave in—it was still standing, and, therefore, under this subsection, the remaining portion of the wall did not collapse. Applying subsection (b), as Cartwright detailed, the wall was merely in danger of falling down (Doc 89-4, at 11 (Cartwright testifying that the wall was not "imminent of collapse right then. If we continued on cutting holes . . . it would be drastically unstable")), and, therefore, it is not in a state of collapse under this subsection. Subsection (c) does not apply, because this subsection only applies to a structure that is not standing, and the remaining portion of the wall was still standing. Lastly, under subsection (d), this portion of the wall was standing and therefore was not in a state of collapse.

GCC and Tahini argue that subsection (c) renders the policy's definition of "collapse" ambiguous, inconsistent, and, therefore, the provision must be construed against Builders

Mutual. (Doc. 95, at 13.) But subsection (c) does not apply to the remaining portion of the wall; the remaining portion of the wall was still standing, and subsection (c) only applies to a part of a covered building that is not standing. While, as discussed above, this provision is ambiguous with respect to the fallen bricks, it is not ambiguous as applied to the remaining standing portion of the wall, because it does not apply to a standing portion of the wall. Courts need only construe provisions of a contract that are at issue. *See Va. Ins. Reciprocal v. Wagner, Myers & Sagner*, No. 03A01-9705-CH-00177, 1998 WL 79011, at *2 (Tenn. Ct. App. Feb. 26, 1998) (construing "policy provision *at issue*") (emphasis added); *Reed v. Tenn. Farmers Mut. Ins. Co.*, 2006 WL 842908, at *2 (Tenn. Ct. App. Mar. 30, 2006) ("The policy provision *at issue* is not ambiguous.") (emphasis added). Accordingly, the policy provision is not ambiguous in this context, because only one plausible outcome can be reached applying the facts of this case to the remaining portion of the wall; the remaining portion of the wall was not in a state of collapse.[13] Because the remaining portion of the wall did not "collapse" under the policy, any "direct physical loss" sustained to the remaining portion of the wall was not caused by "collapse" of the remaining portion of the wall.

However, the policy could still cover the "direct physical loss" of removing and replacing the standing portion of the wall if the "direct physical loss" was caused by the "collapse" of the bricks that fell on November 15, 2021, because that "collapse" was caused by hidden decay. A factual dispute exists as to whether this is the case.

---

[13] GCC and Tahini argue that, because the policy is ambiguous, the Court should apply the definition of "collapse" adopted in *Rankin*. (Doc. 95, at 21.) But the policy at issue in *Rankin* did not define "collapse." 986 S.W.2d at 238. When a contract unambiguously defines a term, as the policy in this case does with respect to a standing structure, the Court must apply the terms of the contract as written, not outside definitions. *See Garrison*, 377 S.W.3d at 670 ("Simply put, the parties' policy must be enforced as written.").

On one hand, Cartwright, the only engineer to inspect the building while it remained standing, concluded that "due to the severe unforeseen deterioration only recently uncovered inside the existing West Brick Wall, that it is not structurally viable to carry the loads of the new renovation." (Doc. 89-15, at 12.) A natural reading of this conclusion supports a finding that the severe unforeseen deterioration itself—rather than the collapse of the bricks—rendered the existing west wall structurally unsound. The policy covers losses—even structural unsoundness resulting from collapses due to hidden decay; but it did not cover structural unsoundness due to hidden decay for a wall that remained standing. (Doc. 89-15, at 12.) Because Cartwright's conclusion supports a finding that the decay, rather than the "collapse" of the bricks, caused the existing west wall to become structurally unsound, a reasonable jury could find that the "direct physical loss" of removing and replacing the structurally impaired wall that remained standing after the bricks fell on November 15, 2021, is not covered by the policy.

However, GCC and Tahini provide evidence that supports a finding that the fallen bricks caused the west wall to become structurally unsound. Butterfield has opined that: (1) "[t]he West Wall was part of the building's structural assembly, and the partial collapse of the center wythe of bricks robbed the West Wall of its structural integrity, leaving, at best, two far weaker walls created by the outermost and innermost wythes of brick that could not rely on each other for support; and (2) [b]ecause of the West Wall's status as part of the overall structural assembly of the building, the structural stability of the North Wall and the South Wall were also negatively affected by both the partial collapse on November 15, 2021 and the required demolition of the West Wall, and each would have required substantial repair to restore integrity to the overall structural assembly of the building." (Doc. 135-1, at 6.) These conclusions would allow a reasonable jury to find that the decay caused the bricks to fall on November 15, 2021, which then

in turn caused the west wall to become structurally unsound. If this is the case, removal and replacement of the wall would be covered under the policy.

Therefore, a factual dispute exists as to whether the "direct physical loss" of removing and replacing the structurally impaired wall is covered by the policy.

### 3. Tahini's Lost Rental Profit

Lastly, Tahini claimed coverage for its lost rental profit. The undisputed facts demonstrate that the lost rental profit stemmed from the impaired structural integrity of the wall. Cartwright opined that, because of the wall's impaired structural integrity, it was not viable to carry the loads of renovation, and he recommended demolishing and replacing the wall. (Doc. 89-15, at 12.) And GCC and Tahini planned to do so, stating in their claim that "[w]e have budgeted the remaining demolition of the west wall at $500k." (Doc. 89-13, at 1.) Accordingly, the undisputed facts show that Tahini's lost rental profit resulted from the impaired structural integrity of the wall.

Because the fallen bricks constitute a "collapse" and because Tahini's lost rental profit was caused by the west wall's impaired structural integrity, Tahini's lost rental profit is covered by the policy if the lack of structural integrity of the wall was caused by the collapse—fallen bricks. As discussed above, there is a factual dispute as to whether this is the case. Therefore, a factual dispute exists as to whether Tahini's lost rental profit is covered under the policy.

### b. Is the "Direct Physical Loss" Excluded?

Given there is coverage for at least some "direct physical loss," the next question is whether such coverage is excluded. Under the policy, coverage is excluded for a "loss" resulting from "[c]ollapse, except as provided in the Additional Coverage section in this Coverage Form" (hereinafter, the "Collapse Exclusion"). (Doc. 90, at 20; Doc. 89-10, at 12–13.) GCC and

Tahini did not submit a claim under any of the enumerated Additional Coverages.[14] (Doc. 90, at 21.)

### 1. Did Builders Mutual Waive the Collapse Exclusion?

GCC and Tahini first argue that Builders Mutual waived the Collapse Exclusion and seek a declaration stating so. (Doc. 94, at 5; Doc. 103, at 6.) Under Tennessee law, "any contractual provision of a policy of insurance, whether part of an insuring, exclusionary, or forfeiture clause, may be waived by the acts, representations, or knowledge of the insurer's agent." *Gatson v. Tenn. Farmers Mut. Ins. Co.*, 120 S.W.3d 815, 819 (Tenn. 2003) (citations omitted). Waiver is generally a question of fact for the jury, and the burden of establishing waiver rests with the insured. *Id.* (first citing *Bill Brown Constr. Co. v. Glens Falls Ins. Co.*, 818 S.W.2d 1, 13 (Tenn. 1991); and then citing *Carolyn B. Beasley Cotton Co. v. Ralph*, 59 S.W.3d 110, 113 (Tenn. Ct. App. 2000)). Waiver can be proved "by express declaration; or by acts and declarations manifesting an intent and purpose not to claim the supposed advantage; or by a course of acts and conduct." *Id.* (quoting *Chattem, Inc. v. Provident Life & Accident Ins. Co.*, 676 S.W.2d 953, 955 (Tenn. 1984)).

In this case, the undisputed facts demonstrate that Builders Mutual did not waive the Collapse Exclusion. GCC and Tahini attempt to analogize Michigan law, which provides "an insurer's denial of liability for specified reasons is deemed, as a matter of law, to warrant the inference that the insurer intends to relinquish its right to assert other defenses of which it has knowledge." (Doc. 95, at 33 (citing *Jones v. Jackson Nat. Life Ins. Co.*, 819 F. Supp. 1372, 1378

---

[14] The "Additional Coverages" section of the policy includes: "Scaffolding, Construction Forms, and Temporary Structures"; "Debris Removal"; "Back-up or Overflow of Sewers, Drains or Sumps"; "Fire Department Service Charge"; "Valuable Papers"; "Pollutant Clean-up and Removal"; "Reward"; "Ordinance or Law- Direct Damage"; Preservation of Property"; and "Change Order Coverage." (Doc. 89-10, at 8–11.)

(E.D. Mich. 1993).)  They further argue that, under Tennessee law, an insurance carrier must expressly reserve rights or defenses or else it is estopped from raising a defense.  (*Id.*)  In its December 7, 2021 letter denying coverage, Builders Mutual did not cite a policy exclusion as its basis for denial, nor did it reserve rights or defenses.  (Doc. 89-14.)  This would not constitute a reservation of rights.  But Builders Mutual reopened the claim when presented with additional information, and it never denied that reopened claim.  (Doc. 89-16, at 1–2.)  Instead, it filed this action.  Therefore, because Builders Mutual set aside the first denial, reopened the claim, and never denied the reopened claim under any provision before filing this action, it did not waive the Collapse Exclusion.

### 2.    *Does the Collapse Exclusion Apply?*

GCC and Tahini next argue that the Collapse Exclusion does not apply.  (Doc. 103, at 7– 8.)  They rely on *Solomon v. Hager*, No. E2000-02586-COA-R3-CV, 2001 WL 1657214 (Tenn. Ct. App. Dec. 27, 2001), a case which also contained an insurance policy that covered "collapse."  While the policy stated that the insurance company would cover "the entire collapse" of a covered building or part of a covered building, it also contained an exclusion which stated that the insurance company did not cover "[c]ollapse, except as specifically provided in Section I—Additional Protection under item 11, '[c]ollapse.'"  *Id.* at *4–5.  In deciding not to exclude coverage, the court approved of the two-part test used by the district court:

> First, it must be determined whether a collapse occurred.  Second, the cause of the collapse must be ascertained.  If the collapse was caused by any of the factors listed in the *coverage* provisions applicable to a "collapse" . . . the collapse is covered.  If the collapse was the result of a factor other than those listed in the coverage provisions pertaining to collapse, the collapse would not be covered . . . [The insurer] will not be permitted to *specifically* provide coverage for an event and then take it away in the *general* language of the policy.

*Id.* at *7–8.

The Court will also apply this two-part test. Applying the first step, a collapse occurred when the bricks fell on November 15, 2021. Second, the collapse was caused by hidden, unknown decay. Hidden, unknown decay is a factor listed in the coverage provisions applicable to collapse. As stated in *Solomon*, since a collapse occurred and since the collapse was caused by a factor listed in the coverage provisions applicable to collapse, the collapse is covered. Therefore, the collapse of the fallen bricks is specifically covered and cannot be excluded by the more general language of the Collapse Exclusion.

In sum, there is no factual dispute as to whether "direct physical loss" occurred under the policy, whether that "direct physical loss" was caused by a "collapse," and whether the "collapse" was caused by unknown, hidden decay. The "direct physical loss" of the fallen bricks is covered under the policy. However, a factual dispute exists as to whether the "direct physical loss" of the instability of the remaining, standing portion of the wall and Tahini's lost rental profit are covered under the policy.

The Court therefore denies Builders Mutual's motion for summary judgment and grants in part and denies in part GCC and Tahini's motion for summary judgment. GCC and Tahini's motion for summary judgment on their counterclaims for declaratory judgment are granted to the extent that there is coverage for replacing the bricks that fell off the exterior west wall on November 15, 2021. The Court declares that there is coverage under the policy for replacing the bricks that fell from the exterior west wall on November 15, 2021.

### ii. *Breach of Contract*

Builders Mutual also moves for summary judgment on GCC and Tahini's counterclaims for breach of contract. (Doc. 90, at 13.) "When a plaintiff alleges breach of contract, he or she is

responsible for proving (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of contract." *Bancorp South Bank, Inc. v. Hatchel*, 223 S.W.3d 223, 227 (Tenn. Ct. App. 2006). Under Tennessee law, "[i]nsurance policies are, at their core, contracts." *S. Tr. Ins. Co. v. Phillips*, 474 S.W.3d 660, 664 (Tenn. Ct. App. 2015) (quoting *Allstate Ins. Co. v. Tarrant*, 363 S.W.3d 508, 527 (Tenn. 2012) (Koch, J., dissenting)).

In this case, for the same reasons discussed above, there is a factual dispute as to whether Builders Mutual breached its contract with GCC and Tahini because there is a dispute as to whether Builders Mutual performed under the terms of the contract. Therefore, the Court will deny Builders Mutual's motion for summary judgment on GCC and Tahini's counterclaim for breach of contract.[15]

### iii.      Bad Faith

Builders Mutual also moves for summary judgment on GCC and Tahini's counterclaims for bad faith. (Doc. 90, at 21.) Tennessee imposes a statutory penalty on insurers who, in bad faith, refuse to pay a claim within sixty days after a demand for payment has been made. Tenn. Code Ann. § 56-7-105. The statute does not give rise to a separate tort; rather, it allows insureds to recover "a sum not exceeding twenty-five percent (25%) on the liability for the loss . . . ." *Id.* To recover this penalty, "an insured must establish that (1) the policy was due and payable; (2) a

---

[15] Although the Court determined there was coverage under the policy for replacing the fallen bricks, GCC and Tahini did not move for summary judgment on any portion of their breach-of-contract counterclaims. Nonetheless, Federal Rule of Civil Procedure 56(f) allows the Court to, after giving notice and a reasonable time to respond, grant summary judgment for a nonmovant. The undisputed facts demonstrate the existence of a valid insurance contract, and, as discussed above, Builders Mutual breached that contract with respect to failing to cover the fallen bricks under the policy. Therefore, the Court is considering granting summary judgment in GCC and Tahini's favor on the issue of the first two elements on their breach-of-contract counterclaims. Any responses shall be filed by **January 17, 2024**.

formal demand for payment was made; (3) the insured waited 60 days after making his demand before filing suit, unless the insurer refused to pay prior to the expiration of the 60 days; and (4) the refusal to pay was not in good faith." *Heil Co. v. Evanston Ins. Co.*, 690 F.3d 722, 730 (6th Cir. 2012). The statute is "penal in nature and must be strictly construed." *Stooksbury v. Am. Nat'l Prop. & Cas. Co.*, 126 S.W.3d 505, 519 (Tenn. Ct. App. 2003); *Palmer v. Nationwide Mut. Fire Ins. Co.*, 723 S.W.2d 124, 126 (Tenn. Ct. App. 1986). "Whether an insurer acted in good faith is generally a fact question for the trier of fact." *Giles v. Geico Gen. Ins. Co.*, 643 S.W.3d 171, 181 (Tenn. Ct. App. 2021). The insured bears the burden of proving that the insurer acted in bad faith in refusing to pay a claim. *Stooksbury*, 126 S.W.3d at 519. Where an insurer has valid reasons, or "substantial legal grounds," for denying coverage, a bad-faith penalty is not appropriate. *Lance v. Owner's Ins. Co.*, No. E2015-00274, 2016 WL 3092818, at *13 (Tenn. Ct. App. May 25, 2016); *Ginn v. Am. Heritage Life Ins. Co.*, 173 S.W.3d 433, 443 (Tenn. Ct. App. 2004); *see also Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 378 (6th Cir. 2007).

In this case, GCC and Tahini have provided evidence from which a reasonable jury could find that Builders Mutual acted in bad faith in denying their insurance claim. While bad faith does not exist if an insurer conducts "an investigation performed with ordinary care and diligence," GCC and Tahini's insurance expert, Warfel, opined that Builders Mutual's "fail[ure] to retain an engineer to conduct such an investigation is at odds with sound claims handling practices in the insurance industry." *Johnson v. Tenn. Farmers Mut. Ins. Co.*, 205 S.W.3d 365, 371 (Tenn. 2006) (citation omitted); (Doc. 96-2, at 34.) Warfel also opined that Builders Mutual "processed this claim in a manner that was inconsistent with sound claims handling practices in the insurance industry." (Doc. 96-2, at 33.) Further, courts have held that the length of investigation may be considered in bad-faith claims, and Builders Mutual denied the claim

within just eleven days.  (Doc. 89-11, at 1); *see Bowery v. Berkshire Life Ins. Co. of Am.*, No. 3:11-cv-03, 2013 WL 1497339, at *10 (E.D. Tenn. Apr. 11, 2013) (noting that a seven-month investigation by the insurance company negated a finding of bad faith).

Builders Mutual argues that it did not act in bad faith, because a legitimate question exists as to whether there is coverage under the policy.  (Doc. 90, at 22.)  It cites *Williamson v. Aetna Life Insurance Co*, 481 F.3d 369, 378 (6th Cir. 2007) for the proposition that if a legitimate question exists, bad faith cannot exit.  However, in that case, the insured "simply [did] not put forth any evidence which disproves [the insurance company's] proffered reasons for denying [its] claim." *Id.*  In this case, as discussed above, GCC and Tahini have put forth evidence from which a reasonable jury could conclude that Builders Mutual failed to adequately investigate its stated reason for denial.

Nor, as Builders Mutual argues, is the issue in this a case a matter of first impression. (Doc. 90, at 23.)  When an insurance coverage issue is a matter of first impression, a finding of bad faith is inappropriate.  *See Brewer v. Aetna Life Ins. Co.*, 490 S.W.506, 512 (Tenn. 1973). This Court did not take up Builders Mutual's alleged matter of first impression:  "whether the rationale in *Rankin* is nonetheless applicable in spite of the express policy language in the . . . policy at issue in this case." (*Id.*)  Rather, the Court followed the well-established Tennessee rules of contractual interpretation in finding the policy inconsistently defined "collapse" with respect to the fallen bricks, that the parties intended to cover a "collapse," and then applied the definition of "collapse" adopted by Tennessee courts when insurance policies do not define the term.

Accordingly, Builders Mutual's motion for summary judgment with respect to GCC and Tahini's bad-faith counterclaims is denied.

####### iv.        *Fraud and Misrepresentation*

Lastly, Builders Mutual moves for summary judgment on Tahini's counterclaim for fraud and misrepresentation.  (Doc. 90, at 24.)  In Tennessee, a claim of intentional misrepresentation is the same as a claim for fraud.  *PNC Multifamily Cap. Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525, 547–48 (Tenn. Ct. App. 2012).  To succeed on a claim of intentional misrepresentation, the plaintiff must show:

> (1) that the defendant made a representation of a present or past fact; (2) that the representation was false when it was made; (3) that the representation involved a material fact; (4) that the defendant either knew that the representation was false or did not believe it to be true or that the defendant made the representation recklessly without knowing whether it was true or false; (5) that the plaintiff did not know that the representation was false when made and was justified in in relying on the truth of the representation; and (6) that the plaintiff sustained damages as a result of the representation.

*Hodge v. Craig*, 382 S.W.3d 325, 343 (Tenn. 2012).  "Claims for fraudulent inducement may involve false statements of past or present facts or false promises made without the present intent to perform."  *Shelbyville Hosp. Corp. v. Mosley*, 69 F. Supp. 3d 718, 728 (E.D. Tenn. 2014).

In this case, the undisputed facts entitle Builders Mutual to summary judgment.  Tahini argues that Builders Mutual made the following fraudulent statements:  (1) Builders Mutual provided the policy to GCC and Tahini knowing that it had a duty to fully investigate a claim but did not do so; and (2) Builders Mutual asked for additional time to respond to the reopened claim investigation and told GCC and Tahini it was "seriously reviewing" the engineering reports and its coverage position but were not.  (Doc. 103, at 11–13.)  Even assuming GCC and Tahini were damaged by these representations, Tahini provides no evidence that could support a finding that these representations were false when Builders Mutual made them or that Builders Mutual knew these statements were false, did not believe them to be true, or was reckless in making them.  Rather, Tahini argues, without citing any evidence, that "Builders Mutual knew all along that it

would maintain its denial of the claim and had already engaged counsel to file suit against the insureds, all while leading GCC and Tahini to believe that it was actually still considering the claim." (Doc. 103, at 12.) This conclusory assertion does not show that the representations were false at the time they were given or that Builders Mutual knew they were false, and, given these statements all involved Builders Mutual's future intent to investigate a claim or review the engineering reports, these statements are not actionable as fraud. *See Power & Tel. Supply Co., Inc. v. SunTrust Banks, Inc.*, 447 F.3d 923, 931 (6th Cir. 2006) ("Statements of future intentions . . . are generally not actionable because they do not involve representations or material past or present fact.") (citing *McElroy v. Boise Cascade Corp.*, 632 S.W.2d 127, 130 (Tenn. Ct. App. 1982)).

Therefore, the Court will grant Builders Mutual's motion for summary judgment with respect to Tahini's counterclaim for fraud and misrepresentation.

## IV. CONCLUSION

For the above-stated reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Builders Mutual's motion for summary judgment (Doc. 88), **GRANTS IN PART AND DENIES IN PART** GCC and Tahini's joint motion for partial summary judgment (Doc. 94), **GRANTS IN PART** and **DENIES IN PART** GCC and Tahini's joint motion to exclude expert testimony of Matthew G. Richardson and John Speweik (Doc. 92), **DENIES** GCC and Tahini's motion to strike testimony cited by Builders Mutual in support of its motion for summary judgment (Doc. 104), **GRANTS** Builders Mutual's motion to exclude certain expert testimony from William Warfel (Doc. 96), **GRANTS** and Builders Mutual's motion to exclude certain opinions of Arch Willingham (Doc. 97). Tahini's counterclaim for fraud and misrepresentation is **DISMISSED WITH PREJUDICE**. The Court **DECLARES** that there is coverage under the

policy with respect to replacement of the bricks that fell from the exterior west wall on November 15, 2021.

Consistent with this opinion, the following issues remain for trial:

1. Whether the "collapse" of the bricks that fell on November 15, 2021, rendered the west wall structurally unsound and any damages resulting from the "collapse" of the bricks;

2. Whether Builders Mutual breached its contract with GCC and Tahini and any damages resulting from any such breach; and

3. Whether Builders Mutual denied GCC and Tahini's insurance claim in bad faith.

**SO ORDERED.**

*/s/ Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**