UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| BUILDERS MUTUAL INSURANCE COMPANY, | ) ) ) | Case No. 1:22-cv-208 |
| *Plaintiff/Counter-Defendant*, | ) ) | Judge Travis R. McDonough |
| v. | ) ) | Magistrate Judge Christopher H. Steger |
| GCC CONSTRUCTION, LLC and TAHINI MAIN STREET, LLC, | ) ) ) ) | |
| *Defendants/Counter-Claimants*. | ) | |

**TRIAL OPINION**

I.     **INTRODUCTION**

This dispute involves a builders-risk insurance policy obtained before the start of work on a century-old brick building in Chattanooga, Tennessee. Defendant/Counter-Claimant Tahini Main Street, LLC ("Tahini") purchased the building to renovate it and lease it to commercial tenants. Tahini hired GCC Construction, LLC ("GCC") as its general contractor.[1] Builders Mutual Insurance Company ("Builders Mutual") issued GCC the policy, which listed Tahini as an additional named insured. In relevant part, the policy covers "direct physical loss or damage" caused by "collapse" if hidden, unknown decay caused such collapse.

On November 15, 2021, GCC's subcontractor cut a rectangle out of the building's west wall in anticipation of placing a window on the third floor of the building. As a result, a number of bricks fell from above the window cut.

---

[1] The Court will refer to Tahini and GCC together as "Claimants."

Before the trial, the Court granted Claimants summary judgment that these fallen bricks constituted a "collapse" under the policy and that this "collapse" was caused by hidden, unknown decay. (Doc. 156, at 35–36, 42.) At trial, Claimants asserted that, after this "collapse," the entire west wall—nay, the entire building—was structurally unsound. The Court was called upon to decide, pursuant to the insurance policy, the extent to which the limited collapse of bricks from above the window cut caused "direct physical loss or damage" to the rest of the west wall and the building as a whole.

The evidence at trial convincingly established that the relatively minor collapse from above the window cut had no significant effect on the remainder of the wall or the building. The building's structural integrity was compromised long before the November 15, 2021 collapse and long before the policy went into effect. The collapse merely revealed the building's long-existing lack of structural integrity. Based on the following findings of fact and conclusions of law, the Court awards neither Claimant any recovery under the policy or on their breach-of-contract and bad-faith counterclaims.

## II. FINDINGS OF FACT

### A. The Policy

Builders Mutual issued GCC an insurance policy with an effective policy period of September 2, 2021, to September 2, 2022. (Pls.' Ex. 2.)[2] Tahini was a named additional insured. (*Id.*) The policy covered losses that occurred within the policy period. (*Id.*) Relevant here, it covered "direct physical loss or damage" that is "caused by collapse of . . . part of a building" if

---

[2] All parties agreed that Claimants bore the burden of proof on their counterclaims. Therefore, they requested that, for purposes of the trial, they refer to Claimants as the "plaintiffs" and Builders Mutual as the "defendant." The Court acquiesced. Therefore, "Pls.' Ex." refers to exhibits offered by Claimants, and "Def.'s Ex." refers to exhibits offered by Builders Mutual.

that collapse is "caused by . . . [d]ecay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse." (*Id.*) This provision did not cover damages to a building caused directly by decay and not by a decay-caused collapse. (*Id.*)

The policy did not define "direct physical loss or damage." (*See id.*) But it defined "loss" as "accidental loss and accidental damages." (*Id.* (internal quotations omitted).) Additionally, the policy contained an addendum for existing building(s) or structure(s). (*Id.*) This addendum, in relevant part, provided that the most Builders Mutual would pay for any "loss" is the least of: (1) "[t]he Limit of Insurance which applies to the existing building(s) or structure(s)"; (2) "[t]he amount [insured] actually spend to repair the damages or destroyed property with property of comparable type or quality"; (3) "[a]ctual cash value of the existing building or structure at the time of 'loss'"; or (4) "[t]he amount [insured] paid for the existing building(s) or structure(s) plus the actual cash value of the improvements made by or for [insured] after [insured] purchased the building(s) or structure(s) up to the time of 'loss.'" (*Id.*) But this addendum did not expand the policy's coverage beyond "direct physical loss or damage," nor did it alter the policy's definition of "loss"; it only changed the calculation of the amount of any "loss." (*See id.*)

### B. The Building and the "Collapse"

The structure of the building at 27 West Main Street experienced very significant deterioration prior to the policy period. In fact, Claimants' own project engineer and expert witness, David Cartwright, observed just after the November 15, 2021 collapse: "It is my professional opinion that *due to severe unforeseen deterioration only recently uncovered* inside the existing west wall, that it is not structurally viable to carry the loads of the new renovation." (Pls.' Ex. 60a (emphasis added).) Simply put, old deterioration—not anything that resulted from

3
Case 1:22-cv-00208-TRM-CHS    Document 181    Filed 01/30/24    Page 3 of 19    PageID #: 4963

the minor collapse—caused the west wall's structural instability. Cartwright also observed that the mortar joints were deteriorated, that courses of brick fell out randomly, and that chunks of brick easily broke apart. (Pls.' Ex. 60b.) Other of Claimants' own witnesses agreed. Claimants' structural engineer, Colby Butterfield, for example, observed that this deterioration was a "ubiquitous issue" and that the center wythes of the exterior walls were likely a "core of rubble" throughout the building. (Pls.' Ex. 110a.) This core of rubble where the center wythe should have been meant that the assumptions supporting Cartwright's load calculations in the project did not exist when he made the calculations in the first place. According to Cartwright, his calculations rested upon a three-wythe brick wall with the wythes bonded together. With a "core of rubble" where a bonded inner wythe should have been, the wall was not viable even before the policy took effect.

On November 15, 2021, this old, hidden, and ubiquitous deterioration was finally exposed. When a window cut was made, bricks fell from above the window cut, primarily from the interior wythe of the three-wythe west wall. Based on GCC's project manager Mitchell McBee's eyewitness testimony, the Court finds that a total of a few dozen bricks fell, enough only to create a pile of bricks a couple feet high under the window cut, tapering off in depth from the wall. McBee testified he could see "separated" vertical mortar above the hole from which the bricks fell. This means that his view of the voids between these wythes was not blocked by the header row only four rows above the window cut.[3] Therefore, at least significant portions of

---

[3] Bricks in a header row run perpendicular to the wall, from the outside inward, tying the two outer wythes to the inner wythe. At the level of a header row, the wall is solid brick. At the level of a non-header row, there are three wythes that do not touch each other.

4

Case 1:22-cv-00208-TRM-CHS   Document 181   Filed 01/30/24   Page 4 of 19   PageID #: 4964

that header row must have fallen too. This is not surprising, given the evidence of extensive deterioration of the bricks.[4]

The Court is convinced that ubiquitous decay had already robbed the wall of its structural integrity long before the November 15, 2021 collapse. Before work began, the west wall, as well as the entire building, was structurally unsound. And, after the collapse, the west wall and the building remained structurally unsound. The November 15, 2021 collapse did not cause a loss of structural integrity; it merely revealed the existing lack of structural integrity. The Court rejects Claimants' conflation of the post-collapse discovery of the wall's pre-existing lack of structural integrity with the minor collapse's causation of that lack of structural integrity.

The Court found the videos and photographs demonstrating the condition of the building compelling. (*See* Def.'s Ex. 70.) These videos showed mortar being easily scraped away with a nail, mortar blowing away in the wind like fine sand, deteriorated bricks being pulled away by hand, and a portion of a wall being knocked down almost effortlessly by a single worker with a piece of wood. (*Id.*) Even so, the remainder of the wall did not move as a result of the small number of bricks falling from the window cut on November 15, 2021. The wall remained in place without any lateral or differential movement. Other than a relatively insignificant number of bricks missing, the west wall after the collapse was no different than it was before the collapse. This limited collapse had no impact on the structural integrity of the west wall or the

---

[4] The Court does not credit the estimate of the number of fallen bricks asserted by John Speweik, Builders Mutual's expert, because it concludes that the portion of the header bricks four rows above the window cut broke within the wall and allowed more of the inner wythe to fall. Speweik's estimate assumed that a header brick that looked intact from the inside of the building was intact inside the wall. But, consistent with the observations of Claimants' witnesses, the Court finds these particular header bricks crumbled just as any other portion of the west wall either would have or had already crumbled.

5

Case 1:22-cv-00208-TRM-CHS    Document 181    Filed 01/30/24    Page 5 of 19    PageID #: 4965

building. Whatever the remainder of the wall and building lacked in structural integrity after the collapse, they had already lacked for years before.

Testimony from Cartwright strongly supports this conclusion. Just three days after the collapse, Cartwright opined that "severe unforeseen deterioration only recently uncovered" caused the wall's lack of structural integrity. (Pls.' Ex. 60a.) He attributed none of the wall's problems to the recent fall of a few bricks. (*See id.*) This statement forcefully militates in favor of a finding that the problem in the building was pre-existing, unexpected, and only uncovered by the November 15, 2021 collapse, not caused by it. In his second report, on June 10, 2022, Cartwright opined that "it became clear that the interior of the brick wall had deteriorated far greater than anticipated" and that "[i]t became clear to all that the interior of the existing brick wall, uncovered to this point, was indeed not structurally stable, and would be unable to support all the renovations needed for this wall." (Pls.' Ex. 60b.) These opinions again suggest that the November 15, 2021 collapse caused nothing more than a revelation of instability; it did not cause the instability itself. But in his June 10, 2022 report, Cartwright also added a new, artfully worded opinion: that the "building sustained direct physical damage and loss as a result of the collapse of an inside existing brick wall on the west side of the building." (*Id.*) He only asserted that the collapse caused some damage. It did. But such a statement falls well short of supporting a finding that the scope of such damage included the entirety of the wall, much less the entirety of the building. The scope of that damage was, as previously found, a few dozen missing bricks from above the window cut.

Time and again, Cartwright stopped short of stating that the falling brick compromised the rest of the wall. When asked at trial whether the falling brick from the middle wythe of the west wall impaired the west wall, he tended to state only that he had no confidence in the

structural integrity of the whole wall. There was, as there should have been, noticeable hesitation about asserting a causal relationship between the very limited collapse and the structural integrity of the wall as a whole. On cross examination, Cartwright confirmed that his concern was not that the wall would immediately collapse, but that further planned work on the wall would create additional issues.

Given Cartwright's role in the project, he had an understandable incentive to support Claimants' theory of coverage. In March 2022, Tahini informed Cartwright that it was continuing its insurance claim on the building and requested that he adopt language drafted by its counsel regarding the collapse. (Def.'s Ex. 86.) The suggested language, at points, matched the policy verbatim, including that the "building sustained direct physical damage and loss as a result of the collapse" and that the collapse was "caused by decay . . . the weight of people, workers, equipment or personal property engaged for the renovation on the building . . . and/or the use of defective materials." (*Id.*) Cartwright said he was "not comfortable" adding the proposed language. (Def.'s Ex. 87.) But after a meeting between GCC and Brad Russell—the namesake of the engineering firm where Cartwright worked—he did just that, at least to a point. (*Id.*; Pls.' Ex. 60b.) Even while on the stand, Cartwright incorrectly stated that the weight of people, workers, equipment, and property caused the collapse, even though he did not include such language in his report, believing that he was agreeing with an attorney for Tahini. But despite this inclination to help Claimants, he displayed a consistent aversion to opining that the November 15, 2021 collapse caused the building's structural unsoundness. When asked whether the collapse of the limited number of bricks rendered the west wall unsound, he merely asserted generally that the wall needed an intact inner wythe to function.[5] When asked whether the

---

[5] It is clear no such intact inner wythe ever existed during the policy period.

collapse rendered the entire building unsound, he merely asserted that he lost confidence in the wall after the collapse. And, on cross-examination, he acknowledged that, other than the limited number of missing bricks above the window cut, he did not see that the wall was compromised in any other way. His written reports were no different; he consistently pointed to the pre-existing decay as the cause of the wall's structural problems, not the impact of the collapse. (Pls.' Ex. 60a; Pls.' Ex. 60b; Pls.' Ex. 62c.)

The testimony of Claimants' other witnesses is consistent with the Court's finding as well. While Butterfield stated in his report that the November 15, 2021 collapse "robbed the West Wall of its structural integrity," he did not quantify the extent of this impact, begging the question of what damage the minor collapse actually caused. (Pls.' Ex. 110a.) Butterfield's testimony and the remainder of his report contradict a liberal interpretation of this conclusion—or at least call such into serious question. Butterfield only went so far as to say that the collapsed brick made a "significant" portion of the wall unstable. (*Id.*) The Court understands this as the portion directly over the window. He never said that the collapse of the bricks caused direct physical loss or damage to the rest of the wall—only that the collapse introduced "uncertainty" in the entire wall. (*Id.*) Such uncertainty is nothing more than a reference to the impact of the discovery of pre-existing decay of the wall, not to any direct physical loss or damage caused by the collapse. Butterfield also observed termite damage, that floor joist ends had been exposed to moisture, rot of the joist ends "at all floor levels," and decay of the mortar in the middle wythe. (*Id.*) The collapse of bricks in the west wall did not cause the rot or decay—which can only be created over time—that Butterfield observed in the west wall, let alone in other parts of the building. (*Id.*) And Butterfield was convinced the decay was a "ubiquitous" issue and that there was a "core of rubble" throughout the west wall, not just above the window cut where the

collapse occurred. (*Id.*) The partial collapse merely caused a "consensus" about proceeding with the planned renovations on the west wall, not further damage to it. (*Id.*)

Nor does Arch Willingham's testimony that the building was "unbuildable" after the collapse show the collapse changed the condition of the building. The evidence shows the building was unbuildable before the collapse. Willingham's testimony merely points to newly gained knowledge of the building's pre-existing state and the reticence of those working on the project to move forward despite such knowledge, similar to Butterfield's testimony about "consensus."

In January 2022, with no notice to Builders Mutual, Claimants demolished the west wall. The decision was based on their opinion that the fallen bricks from the center wythe could not be repaired without removing the entire west wall. However, Builders Mutual's expert John Speweik testified that the bricks could have been repaired. The Court credits Speweik's testimony, at least to the extent that the few bricks that fell could have been replaced, even if some of the bricks from another wythe would have to be temporarily removed for purposes of accessing the inner wythe. But, even though such repairs would have improved the wall's structural integrity, the wall would remain unviable, just as it had long been.

C.    **The Investigation**

On November 18, 2021, Builders Mutual received notice of a claim under the policy. (Pls.' Ex. 1.) Builders Mutual assigned Kim Allen as the claims representative. (*Id.*) Allen contacted an independent adjuster in Chattanooga, Greg Bankston, to inspect the site. (Pls.' Ex. 4.) She told Bankston the claim was for the interior wall collapsing and that the insured wanted someone at the site the next day. (*Id.*) The next day, November 19, 2021, Bankston investigated the site. Bankston went without an engineer to the site and very briefly spoke to McBee, who

9

Case 1:22-cv-00208-TRM-CHS   Document 181   Filed 01/30/24   Page 9 of 19   PageID #: 4969

told him the wall had not collapsed.[6]  Bankston walked around the site, observed the wall, took pictures of the wall, and reported his findings to Allen via phone.  (Pls.' Ex. 7; Def.'s Ex. 151.)  He looked up into the void above the window cut and was unable to see how many rows of bricks had fallen from the center wythe.  However, from outside the building and from inside the building, the wall appeared substantially intact.  (Pls.' Ex. 5.)

On November 23, 2021, GCC represented that "the building [was in] a state of failure/collapse" and that GCC had budgeted $500,000 to demolish the west wall.  (Def.'s Ex. 6.)  It also attached a report prepared by Cartwright.  (*Id.*)  In this report, Cartwright opined that "due to the severe unforeseen deterioration only recently uncovered inside the existing West Brick Wall, that it is not structurally viable to carry the loads of the new renovation."  (Pls.' Ex. 60a.)  GCC also included pictures of the wall and building.  (*Id.*)

Allen reviewed Bankston's findings, as well as Cartwright's report and photographs.  Getting a quick answer from Builders Mutual was important to Claimants due to their construction schedule and the delay the claim process was causing.  After emails from Jason Rothenberg, GCC's Director of Development Services, requesting updates on the claim, on November 29, 2021, Allen informed GCC via email that coverage was being denied because "the 'collapse' is not being caused by a covered peril . . . [and] [c]ollapse must result from a covered peril."  (Pls.' Ex. 3.)  A week later, Allen sent an official denial letter, which stated that "[a] covered building or structure or any part thereof that is in danger of falling down or caving in is not considered to be in a state of collapse" and that "[a] covered building or structure that is

---

[6] Claimants objected to this testimony as hearsay.  Consistent with the Court's memorandum opinion denying Claimants' motion to strike this testimony on summary judgment (Doc. 156, at 28), this statement is not hearsay.  The Court relies on this out-of-court statement to prove what McBee told Bankston, not whether what McBee told Bankston was true.

standing or any part of a covered building or structure that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling[,] shrinkage or expansion." (Def.'s Ex. 11.)

To that point, given Claimants' broad assertion of a claim for the entire wall, Builders Mutual's focus on that broader scope was reasonable. Claimants simply did not draw attention to the more restricted coverage the policy provided—physical damage or loss actually caused by the relatively minor collapse. Claimants reported the entire wall as being in a state of collapse. Yet, when Bankston arrived, it looked largely the same as it had before the project started. His reporting about the facts of the situation, as well as Builders Mutual's decisions based on those facts (and Claimants' focus on the entire wall) were reasonable—reasonable enough, in fact, that Claimants took no further action on the policy for months.

In June 2022, then represented by counsel, Tahini sent Builders Mutual a demand letter for payment under the policy and a notice of bad faith. (Pls.' Ex. 12.) In this letter, it claimed $614,225 in "direct physical loss" under the policy and $465,000 in lost rental profit. (*Id.*) This was the first clear suggestion by either Claimant that the November 15, 2021 collapse had caused direct physical loss and damage, as opposed to asserting the building generally was in a state of collapse. Tahini attached an updated engineering report from Cartwright. (Pls.' Ex. 60b.) Cartwright's revised report still contained his initial conclusion "that due to the severe unforeseen deterioration only recently uncovered inside the existing West Brick Wall, that it is not structurally viable to carry the loads of the new renovation." (*Id.*) But he also added:

> Further, it is my professional opinion that this building sustained direct physical damage and loss as a result of the collapse of an inside existing brick wall on the west wide of the building. It is my opinion that the same constitutes a state of collapse of all or part of the building or structure caused by decay that was hidden from view or discovery based on the nature of the inside or internal aspect of the

11
Case 1:22-cv-00208-TRM-CHS   Document 181   Filed 01/30/24   Page 11 of 19   PageID #: 4971

brick wall such that the collapse occurred during the course of said construction, remodeling or renovation.

(*Id.*) Two weeks later, Builders Mutual, through Allen, responded requesting additional information regarding whether coverage was being claimed for the interior or exterior wall. (Def.'s Ex. 13.) After Tahini replied with the requested information, on August 11, 2022, Builders Mutual stated that it was "seriously reviewing" the claim and asked for a twenty-one-day extension. (Pls.' Ex. 16.) In the meantime, Builders Mutual obtained a coverage opinion from counsel. It then filed an action for declaratory judgment on August 19, 2022. (Doc. 1.)

### III. CONCLUSIONS OF LAW

#### A. Coverage Under the Policy

The Court has already held that the replacement of the fallen bricks is covered under the policy. (Doc. 156, at 42.) At trial, Tahini requested compensation for the following losses under the policy: (1) removal and replacement of the west wall; (2) the cost of rebuilding the entire building, or, in the alternative, the cash value of the building; (3) the purchase price plus the cost of improvements to the building; and (4) lost rental profit. GCC sought damages for debris removal and lost profit under the policy.

##### i. *Tahini's Award for the Fallen Bricks*

Although the Court previously held that Tahini is entitled to the cost of repairing the fallen bricks under the policy, Tahini put on no proof of such damages at trial. Instead, it argued that the bricks could not be replaced and that the entire wall had to be replaced. As stated above, the Court credits Speweik's testimony that the fallen bricks could have been replaced. Without proof of such damages, the Court awards no damages.

### ii. *Removal and Replacement of the West Wall or Entire Building*

The policy provides coverage for "direct physical loss or damage" resulting from a "collapse" if that collapse was the result of unknown, hidden decay. (Pls.' Ex. 2.) On summary judgment, the Court found that the bricks falling on November 15, 2021, constituted a "collapse" under the policy but that structural unsoundness is not a "collapse" under the policy.[7] (Doc. 156, at 35, 37.) Therefore, the removal and replacement of the entire west wall would only be covered if the November 15, 2021 collapse caused the west wall to be structurally unsound. Likewise, replacing the entire building would only be covered if the November 15, 2021 collapse rendered the entire building structurally unsound. But the evidence is overwhelming that the collapse had no such impact. In fact, its impact was negligible, affecting only a small portion of the west wall.

Claimants effectively ask the court to assume the building was structurally sound before the renovations. But it was not, and their own experts established as much. The collapse merely revealed that the wall was unsound to begin with. The limited collapse did not cause the wall to become unsound. Any need for removal and replacement of the wall was not caused by the collapse; it merely led to a decision to replace an already damaged wall after the full extent of that pre-existing damage was discovered.

---

[7] Even if the Court had adopted Claimants' argument on summary judgment that "collapse" means "substantial impairment of the structural integrity of the building or any part of the building," as discussed in *Rankin ex rel. Rankin v. Generali-U.S. Branch*, 986 S.W.2d 237, 238 (Tenn. Ct. App. 1998) (collecting cases), there would still not be coverage for the entire wall. Given the severe deterioration of the building, it is clear that the building was rendered unstable long before the policy period—which started on September 2, 2021, just over two months before the collapse—began. (Pls.' Ex. 2.) The severity and extent of the decay could not possibly have occurred over a period of two months. The building was unstable long before the coverage period of the policy. Any pre-policy "collapse" of the remainder of the wall under this alternative legal theory likewise results in no further coverage. (*Id.*)

The west wall was in substantially the same state before work began as it was after the November 15, 2021 collapse. Claimants effectively ask the Court to award them damages based on the difference between their expectation of the wall's soundness and the reality they discovered after the collapse—not based on any direct physical loss or damage the collapse caused, as the policy requires. The policy provides coverage for "direct physical loss or damage" resulting from a "collapse," not pre-existing damage revealed after a collapse. (Pls.' Ex. 2.)

Additionally, the impaired structural integrity is not "direct physical loss or damage" under the policy. The policy does not define "direct physical loss or damage"; it only defines "loss" as "accidental loss and accidental damage." (Pls.' Ex. 2 (internal quotations omitted).) Nor have Tennessee courts interpreted the term "direct physical loss or damage" under similar insurance policies. But the Sixth Circuit, interpreting Michigan law, has held that "direct physical loss" only includes "tangible, physical losses, [not] economic losses." *Universal Image Productions, Inc. v. Fed. Ins. Co.*, 475 F. App'x. 569, 573 (6th Cir. 2012) (collecting cases). Additionally, the Sixth Circuit cited approvingly a case stating that "[a] direct physical loss contemplates an actual change in insured property then in a satisfactory state, occasioned by accident or other fortuitous event directly upon the property causing it to become unsatisfactory for future use or requiring that repairs be made to make is so." *Id.* (quoting *MRI Healthcare Ctr. of Glendale, Inc. v. State Farm Gen. Ins. Co.*, 115 Cal. Rptr. 3d 27, 37–38 (Cal. Ct. App. 2010)). The Court finds this definition persuasive. Applying this definition, the structural impairment was not a "direct physical loss," because the property did not change from a satisfactory state to an unsatisfactory state. Rather, the November 15, 2021 collapse merely put Claimants on notice that the wall was and had been in an unsatisfactory state for a long time.

14
Case 1:22-cv-00208-TRM-CHS   Document 181   Filed 01/30/24   Page 14 of 19   PageID #: 4974

### iii. Tahini's Purchase Price Plus Cost of Improvements to the Building

This argument relies on the same basis as Tahini's argument that it is entitled to the cost of the removal and replacement of the wall and entire building. Tahini essentially asserts that, because the "collapse" of the bricks made clear that the wall and building were structurally unsound, it was forced to halt renovations. Accordingly, it saw no value from the renovations and purchase price of the building it had already incurred. These costs are not covered for the same reason as above; the November 15, 2021 collapse did not cause the damage that convinced Tahini to abandon the project. It only revealed that Tahini had begun renovating a wall that could not be renovated and had to terminate the project. The policy provides no coverage for such alleged losses.

### iv. Tahini's Lost Rental Profit

For the Court to award Tahini's lost rental profit, the "collapse" must have caused the building to become unrentable. For reasons already discussed, it did not. The collapse did not cause the wall or building to become structurally unsound or unrentable. It already was, long before the policy began. Therefore, the policy provides no coverage.

Additionally, lost rental profit is not a "direct physical loss," because it is a purely economic harm. While the policy contains an addendum which allows for actual cash value of the existing building or the value of improvements made to the building, the provision affects only the loss calculation, not the prerequisite of "direct physical loss" under the policy. (Pls.' Ex. 2.)

### v. GCC's Costs to Remove Fallen Bricks

The fallen bricks are a "direct physical loss" under the policy. The policy covers debris removal up to $50,000 if the debris results from a "loss" that is covered under the policy. (Pls.'

Ex. 2.) However, GCC put on no proof of costs it incurred to clean up the debris. While Alex Grace stated that GCC incurred $50,000 in incidental costs to shut down the project, he testified that not all of this amount could be attributed to removing the fallen bricks, that the debris-removal costs were "insignificant" compared to the entire west wall, and that GCC never told Builders Mutual that it incurred costs for debris removal. Simply put, GCC failed to put on proof of the cost incurred to remove debris, and the Court awards nothing with respect to this coverage.

> *vi.* **GCC's Lost Profit**

For GCC's lost profit to be covered, it would need to arise from a "direct physical loss" caused by the collapse. It appears GCC's logic is that the collapse caused the building to become structurally unsound which in turn stopped the renovations, and GCC's profits were contingent on completing the renovations. Because the collapse is not what caused the building to become structurally unsound, GCC is not entitled to its lost profit. Additionally, GCC's lost profit is a purely economic harm and is not a direct physical loss.

> **B.** **Whether Builders Mutual Breached its Contract with Claimants**

"When a plaintiff alleges breach of contract, he or she is responsible for proving (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of contract." *Bancorp South Bank, Inc. v. Hatchel*, 223 S.W.3d 223, 227 (Tenn. Ct. App. 2006). Under Tennessee law, "[i]nsurance policies are, at their core, contracts." *S. Tr. Ins. Co. v. Phillips*, 474 S.W.3d 660, 664 (Tenn. Ct. App. 2015) (quoting *Allstate Ins. Co. v. Tarrant*, 363 S.W.3d 508, 527 (Tenn. 2012) (Koch, J., dissenting)).

As discussed above, there is only coverage for the fallen bricks, and, therefore, Builders Mutual only could have breached a contract with respect to that portion of the claim. And

because, as explained above, neither Claimant put on proof for the value of damages associated with repairing the fallen bricks, they are not entitled to any damages on this claim.[8]

### C. Whether Builders Mutual Denied Claimants' Claim in Bad Faith

Tennessee imposes a statutory penalty on insurers who, in bad faith, refuse to pay a claim within sixty days after a demand for payment has been made. Tenn. Code Ann. § 56-7-105. The statute does not give rise to a separate tort; rather, it allows insureds to recover "a sum not exceeding twenty-five percent (25%) on the liability for the loss . . . ." *Id*. To recover this penalty, "an insured must establish that (1) the policy was due and payable; (2) a formal demand for payment was made; (3) the insured waited 60 days after making his demand before filing suit, unless the insurer refused to pay prior to the expiration of the 60 days; and (4) the refusal to pay was not in good faith." *Heil Co. v. Evanston Ins. Co.*, 690 F.3d 722, 730 (6th Cir. 2012). The statute is "penal in nature and must be strictly construed." *Stooksbury v. Am. Nat'l Prop. & Cas. Co.*, 126 S.W.3d 505, 519 (Tenn. Ct. App. 2003); *Palmer v. Nationwide Mut. Fire Ins. Co.*, 723 S.W.2d 124, 126 (Tenn. Ct. App. 1986). "Whether an insurer acted in good faith is generally a fact question for the trier of fact." *Giles v. Geico Gen. Ins. Co.*, 643 S.W.3d 171, 181 (Tenn. Ct. App. 2021). The insured bears the burden of proving that the insurer acted in bad faith in refusing to pay a claim. *Stooksbury*, 126 S.W.3d at 519. Where an insurer has valid reasons, or "substantial legal grounds," for denying coverage, a bad-faith penalty is not appropriate. *Lance v. Owner's Ins. Co.*, No. E2015-00274, 2016 WL 3092818, at *13 (Tenn. Ct. App. May 25, 2016); *Ginn v. Am. Heritage Life Ins. Co.*, 173 S.W.3d 433, 443 (Tenn. Ct. App.

---

[8] The parties dispute whether damages for a breach-of-contract claim and a claim for recovery under an indemnity insurance policy are coextensive. (Doc. 170, at 1–2; Doc. 171, at 1–4.) The Court need not answer this question, because, as discussed above, the only breach is failure to pay for repairing the fallen bricks. And, also as discussed above, none of Claimants' claimed damages resulted from Builders Mutual's failure to pay for the fallen bricks.

2004); *see also Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 378 (6th Cir. 2007). "To discharge its duty to act in good faith, an insurer must exercise ordinary care and diligence in investigating the claim and the extent of damages for which the insured may be held liable." *Johnson v. Tenn. Farmers Mut. Ins. Co.*, 205 S.W.3d 365, 370 (2006) (citing *S. Fire & Cas. Co.*, 250 S.W.2d 785, 787 (1952)).

Preliminarily, as discussed above, there is no coverage for any damages beyond removing the fallen debris and replacing the fallen bricks. Because one element of a bad-faith claim is that the policy is due and payable, Claimants fail on their counterclaims to the extent they are based on denial of coverage for anything beyond the fallen bricks. Additionally, because the Court awarded no monetary relief to Claimants, they are not entitled to any bad-faith award. Even though the fallen bricks were covered under the policy, neither Claimant offered proof of the damages incurred to replace or clean up these fallen bricks. The Court may impose a bad-faith penalty totaling up to twenty-five percent of the coverage amount. The evidence reflects only that the loss covered by the policy was "insignificant" compared to the entire west wall.

Regardless, with respect to the coverage for the fallen bricks, the Court finds that Builders Mutual investigated this claim with ordinary care and diligence. The initial claim never mentioned the bricks that fell and instead focused on replacing the entire wall. (Def.'s Ex. 6.) The pictures submitted alongside the claim showed at most a few bricks on the ground. (Pls.' Ex. 5.) Bankston's actions were also reasonable. It is understandable that he immediately reported there was no collapse and that he did not focus on the few bricks on the ground when Claimants directed his attention elsewhere. Claimants instead focused on the entire wall suffering a "collapse" and needing replacement. (Def.'s Ex. 6.) Even McBee told Bankston that the wall did not collapse and that, rather, Claimants were just afraid to continue renovations

because the wall was unstable. Bankston justifiably concluded that the wall, still standing, had not collapsed.

While Dr. William Warfel testified as to actions Builders Mutual should have taken and deficiencies in its claims-handling process, all these actions were unnecessary in this case. Claimants focused on the wall as a whole in their claim to Builders Mutual, as well as to Bankston when he visited the site. They provided few specifics. They wanted a quick answer given the importance of the project, and they got one. Claimants then waited six months before challenging the coverage determination and provided little additional information other than an updated engineering report that incorporated some of the policy's language verbatim but continued to acknowledge that most of the claim was for uncovered decay that preceded the collapse. Under these circumstances, the Court will award no penalty.

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that neither Claimant is entitled to any damages under the policy or on the counterclaims. Accordingly, the Court **ORDERS** that Claimants recover nothing and that the action be dismissed with prejudice. The Court **DECLARES** that the policy does not provide coverage for the structural instability of the west wall as a whole or the building in general and that, based on the proof at trial, Builders Mutual is not obligated to indemnify, reimburse, or compensate or otherwise pay Claimants for the claimed loss and damage.

**AN APPROPRIATE JUDGMENT SHALL ENTER.**

/s/ *Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**